HILL *v.* LOCKWOOD and others.

*(Circuit Court, E. D. Wisconsin. June 24, 1887.)*

**TRADE MARK—CONTRACT FOR ROYALTIES—BREACH.**

By the terms of a written contract between the plaintiff and the defendant, in which it was stated that it was for the mutual interest of both parties thereto that the defendant should have the sale of certain mineral water, known as "Clysmic Water," taken from plaintiff's spring of the same name, for the purpose of increasing the sale thereof, it was agreed that, in consideration of the payment of a certain royalty, the defendant should have, for a long term of years, the exclusive sale of such waters in the United States and foreign countries. *Held* that, during the life of the contract, the defendant had no right to sell other mineral waters, under the same name, in competition with the waters of plaintiff's spring, notwithstanding the fact that he had himself given the name to the waters before plaintiff acquired title to the spring.

*Jenkins, Winkler, Fish & Smith*, for complainant.

*Finches, Lynde & Miller*, for defendants.

DYER, J. The material facts upon which the decision in this case turns are, in the main, undisputed. The complainant's bill is for an injunction and accounting, and for the cancellation of a contract. It appears that on the thirty-first day of May, 1878, Samuel W. Warner and Alice F. Showerman were the owners of a lot in the village of Waukesha, upon which there was a spring of mineral water, valuable for its medicinal quality, and for table use. The owners of the spring, and the defendant Lockwood, on the day mentioned, entered into a contract, by which Lockwood acquired the exclusive right to sell the water supplied by the spring in the New England and Middle states, Maryland, and the Dis-

trict of Columbia, for the term of 15 years. He was to pay for the water fifty cents per barrel for five years, after that one dollar per barrel, and a certain proportion was to be furnished without charge. Shortly before, or certainly at the time of the execution of this agreement, the spring was named "Clysmic Spring;" and by that name it was ever afterwards known and recognized by the parties in interest, and by the public. No other spring in Waukesha bore the name of "Clysmic." The defendant Lockwood then entered upon the work of developing the spring, placed it in condition for conveniently taking the water therefrom, extensively advertised its medicinal qualities, and thenceforward, to the first of January, 1879, made sales of the water under the agreement of May, 1878, as "Clysmic Water."

On the sixth day of January, 1879, the complainant purchased the spring property from Warner and Showerman. It is claimed by the complainant that she was induced to make the purchase by representations of Lockwood that he had widely extended the reputation of the spring, and that, if she would acquire the ownership of the property, and give him the exclusive and unlimited sale of the water for a period of 20 years, he would devote his entire time to the control and management of the spring, and would make large profits for both parties. The defendant Lockwood denies that he made such representations to the complainant, and contends that she made the purchase independently of any solicitation or representation on his part. Whether it be true or not that she made the purchase upon the specific inducement or representation alleged, the court is satisfied from the evidence that the complainant, in becoming interested in the enterprise, and in acquiring the ownership of the spring, was largely influenced by the expectation held out to her by Lockwood, that, under his management, her acquisition of the spring would be made profitable. Of this it seems there can be little doubt; and she purchased the spring with the name "Clysmic" attached to it, and knowing that the waters of the spring were being sold by that name. Lockwood had been desirous, before Mrs. Hill's purchase, of securing an extension of his right to sell the water from 15 to 20 years, and also an enlargement of the right, so that it should be unlimited in territorial extent; and the negotiations and circumstances point to the conclusion that this was the chief object in view, on his part, when the complainant purchased the spring. This view of the circumstances under which Mrs. Hill acquired the ownership of the property, is confirmed by the fact that on the fifteenth day of February, 1879, she entered into a contract with Lockwood, which began with the recital: "Whereas, it is deemed for the mutual interests of the parties hereto, for the purpose of advancing the sale of the waters from such spring, [meaning the Clysmic spring in question,] that the party of the second part [Lockwood] should have the sale thereof;" and then provided, among other things, that the complainant should furnish Lockwood with the spring water as he required, for the purpose of selling the same in any and all parts of the United States, or for export to any foreign country; that Lockwood should have, during the continuance of the agreement, the exclusive

right to purchase and take the water, and that she would not sell or give away the water to any other person, and by which agreement Mrs. Hill gave Lockwood the right to enter upon and use the property for the purpose of procuring the water. The agreement, by its terms, was to continue in force 20 years, and provided for the payment by Lockwood to Mrs. Hill of certain fixed royalties on each barrel and half barrel of water taken from the spring.

After the execution of this agreement, Lockwood continued the sale of the water from the spring; and the testimony tends to show that, at the close of the year 1883, the business had become extensive and lucrative. He caused the water to be analyzed by a distinguished chemist, advertised it in newspapers and in pamphlet form, and procured many testimonials of its value for medicinal and table uses; and the water was not only sold in barrels and half barrels, but in bottles, which, with other inscriptions thereon, were labeled "Clysmic," "Natural Mineral Spring Water from Clysmic Spring, Wis.," "The King of Table Waters," etc.; and as "Clysmic Water" it acquired a high reputation among consumers throughout the country, which was largely due to the exertions of Lockwood in developing the enterprise and prosecuting the business.

As the reputation of the water became extended, and the demand for it increased, Lockwood conceived the project of developing another spring in his own right of ownership, and marketing water therefrom, under the name of "Clysmic," in connection with the sale of the waters of complainant's spring. In furtherance of this scheme, he purchased a piece of ground adjacent to the spring lot of the complainant, and subsequently opened up a new well or spring, and in February, 1884, began to ship and sell water from this source, in the same manner, by the same name, and under the same label, substituting only "Clysmic *Springs*" for "Clysmic *Spring*," as he had been selling from the complainant's spring; and by August 11, 1884, according to the testimony as it is understood by the court, he had shipped from the new spring, of which he was the owner, nearly 600 barrels of water, which were branded "Clysmic Water," and which he sold to patrons as and for "Clysmic Water." From the time the new spring was opened and developed, the defendant shipped water indiscriminately from either spring in filling orders for "Clysmic Water," and this he claims the legal right to do; his contention being that the contract relations between himself and the complainant do not oblige him to deal exclusively in the waters of complainant's spring, and that as he first adopted and used the name "Clysmic" in developing the spring and selling the water, he became the personal proprietor of the name as a trade-mark, and may therefore apply it to his own spring, and the water derived therefrom. A good deal of testimony has been taken on the question of the comparative merits of the waters of the two springs, in point of quality and chemical constituents, but this question is regarded quite immaterial, so far as it has any bearing upon the essential points of legal controversy in the case.

It is not difficult to discover the object which the parties had in view, and sought to attain, in making the contract of February 15, 1879. The

language of the contract and the attendant circumstances clearly explain the transaction. The right of the defendant Lockwood to deal in and sell the water under the Warner and Showerman contract was a narrow one, so far as it embraced territory in which sales could be made. Nevertheless, the business promised to be lucrative. To make it as fully profitable as he wished, the defendant desired an enlargement of his rights of sale, both as to term of years and territory, and this was undoubtedly contemplated by both parties when Mrs. Hill purchased the spring. Her purchase and the making of the contract of February, 1879, were unquestionably prompted by the expectation of such a conduct of the business as would make the spring a source of profit to her, as well as to Lockwood. The name of the spring was established and known, and its reputation was growing. In this state of circumstances, and with these ends in view, the contract was made. It was therein declared in the outset, as we have seen, that it was deemed for the mutual interests of the parties, for the purpose of advancing the sale of the water of the spring, that Lockwood should have the sale thereof. This was the declared purpose of the parties—the sale of the waters of the spring was to be advanced, and the mutual interests of the contracting parties thereby promoted. This was the basis of the contract relation to be established, and, on the faith of it, Lockwood was to have the sole and exclusive right to deal in the water, and the complainant bound herself not to sell, give, or dispose of any of the water to any other person. It is true that the contract contains no provision expressly restraining Lockwood from selling or dealing in the water of any other spring during the specified term. And we do not now decide that he was not at liberty, during the life of this contract, under any circumstances, to sell the waters of any other spring. That is a question which does not now necessarily arise. But we do say that it was his duty fairly and in good faith to advance the sales of the water of the complainant's spring, and thereby, so far as there was a demand for it in the market, and among consumers, enable the complainant to realize such profits as were contemplated when the contract was made. In view of all the circumstances then existing, it was certainly not consistent with a performance of the contract in its meaning and spirit, for the defendant to open up a new spring on an adjoining lot, in which he alone was interested, and place the waters of that spring in competition with the waters of the complainant's spring, supplying the demands of the market as well from his own spring as from that of the complainant. Especially was this act of the defendant a violation of the contract relations between himself and the complainant, when he advertised and sold the water taken from his spring as "Clysmic Water," for that was an act, the direct effect of which would be to diminish the sales of water from complainant's spring, which had become the recognized source of the water previously sold by that name.

The contention of the defendant that the name "Clysmic," as applied to the complainant's spring, was not appurtenant thereto, but was his own property, and that he was at liberty to use it as descriptive of any other spring, or any other spring water in which he might deal, is un-

tenable, and cannot be sustained. In the acquisition of the spring property, and by virtue of the contract relations between the parties, which were almost concurrent with Mrs. Hill's purchase, she acquired such an interest in the word "Clysmic" as a name or *quasi* trade-mark, when applied to the spring, and the waters taken therefrom, as forbade its use by the defendant, certainly during the term specified in the contract of February, 1879, in the designation of rival waters. It is true that the defendant first applied the name to the spring. The signification of the word, and its euphonious sound, made it, in his mind, an appropriate designation of the spring and its waters when placed upon the market. But it is to be observed that the spring bore that name when the complainant purchased it. Her purchase was made when the defendant was advertising and selling the product of the spring as "Clysmic Water," and, as we conclude, in anticipation of the contract relations which were speedily consummated. Such was the state of affairs when the contract was executed, and in view of all the circumstances the transfer of the name by the defendant to a rival spring was directly antagonistic to the interests of the complainant, which the contract in terms declared it was intended to promote, and operated as a fraud upon her rights.

There are trade-marks to which the characteristic of personal proprietorship attaches, because they assert to the public that some particular person has given his special skill to the production or selection of the articles they cover. *Leather Cloth Co.* v. *American L. C. Co.*, 11 H. L. Cas. 544; *Hoxie* v. *Chaney*, 143 Mass. 593, 10 N. E. Rep. 713; *Holt* v. *Menendez*, 23 Fed. Rep. 869. There is another class of trade-marks, which assert for the articles they designate some particular place of origin. In such case the trade-mark is inseparable from the place. It passes as an incident with the sale of the place. *Congress Spring Co.* v. *High Rock Congress Spring Co.*, 45 N. Y. 302; *In re Swezey*, 62 How. Pr. 219; *Manufacturing Co.* v. *Hall*, 61 N. Y. 226; *Pepper* v. *Labrot*, 8 Fed. Rep. 29; *Milling Co.* v. *Robinson*, 20 Fed. Rep. 218.

It is unnecessary to review the authorities in detail. Limiting this decision, as we do, to an adjudication of the rights of the complainant and the defendant Lockwood during the continuance of the contract relations subsisting between them, we must hold that the name "Clysmic" became affixed and appurtenant to the complainant's spring, as indicating the source of the water known to the public as "Clysmic Water," and that the complainant cannot be deprived, in the manner attempted by the defendant, of the advantage which has accrued to her, as the purchaser of the spring, from such designation. We regard this ruling as fully sustained by the principles laid down in the case of *Congress Spring Co.* v. *High Rock Congress Spring Co.*, *supra*.

*Woodward* v. *Lazar*, 21 Cal. 448, much relied on by counsel for the defendant, is distinguishable in principle, and in its facts, from the case at bar. There, the lessee of a lot of land, (the plaintiff in the case) erected upon it a building which he occupied as a hotel, to which he gave the name of "The What Cheer House." Before the expiration of his lease, he purchased an adjoining lot, upon which he erected a larger

building, and for a time occupied both buildings as "The What Cheer House," the principal sign being removed to the one last built. He subsequently surrendered the leased lot, with the building which was on it, and continued the business, under the same name, entirely in the building which he had erected on the lot he had purchased. Two months afterwards, the defendants, having purchased the first-mentioned lot and building, opened there a hotel under the name of "The Original What Cheer House;" the word "Original" being painted on the sign in small letters, and in a manner calculated to deceive the public into the supposition that it was the same name as that given to the first hotel. The point in dispute was as to whom the name "What Cheer House," as a business sign, belonged. The plaintiff claimed that it belonged to him as keeper of the hotel, which he continued to conduct under that name, after he surrendered the leased premises; while the defendants claimed that it was the designation of the building in which the business under that name was first conducted, and became theirs when they became the owners of the building. The court sustained the plaintiff's contention, holding that as a tenant he did not by giving a particular name to the leased building, as a sign of the business done at that place, thereby make the name a fixture appurtenant to the building, and transfer it irrevocably to the landlord. But suppose that a third person had come into ownership of the premises with the concurrence of the tenant, and in pursuance of a mutual expectation, speedily followed by a consummated agreement, to the effect that the hotel should be occupied and conducted by the same tenant, for a term of years thereafter, by the name of "The What Cheer House," and that both parties should participate in the profits of the enterprise—the one as landlord receiving rents dependent in amount upon the profits made, and the other as tenant directly receiving the gains realized, each agreeing to promote the interests of the other, by advancing, as far as possible, the patronage of the hotel. And then suppose that with this contract relation in force, the tenant had built another hotel on adjacent premises, and given it the name of "The What Cheer House," and established therein a rival business, tending directly to interfere with, and to diminish, the business of the first-named hotel, and thus to defeat the very objects which the parties had originally in view, and which constituted the inducement to the purchaser to purchase the property. That would have been a case similar to the one at bar, and a very different case from that decided in *Woodward* v. *Lazar*. Moreover, in that case the court placed stress upon the fact that the plaintiff surrendered the leased premises after he had transferred the business and name to the new hotel, and that the old building remained unoccupied for several months thereafter, during which time, if not otherwise, the plaintiff had established an exclusive right to the name, as the trade-mark for his new house.

On the grounds previously stated, and without extending the discussion further, we are of the opinion that the complainant is entitled to a decree in her favor. But we think the annulment or forfeiture of the contract of February 15, 1879, ought not, at least at present, to be

adjudged. It is true the defendant is found guilty of violating the contract, but it is doubtful if the violation is of such a willful and aggravated character as to justify a decree of forfeiture. The contract contains no provision to the effect that in case of its breach by either party the other should have the option to declare it terminated; and if the rights of the complainant can be sufficiently guarded in the decree,—as we think they can,—and the contract be continued in force, we are of the opinion that course should be pursued.

A decree will be entered restraining the defendants during the whole period of 20 years from the fifteenth day of February, 1879, from shipping or selling any water from the spring of the defendant Lockwood, as or under the name of "Clysmic Water," and from in any manner applying or using the word "Clysmic," during that period, in the sale of any water, except that derived from the spring of the complainant. Also, that the complainant recover damages against the defendant Lockwood by reason of the water shipped and sold from the defendant's spring as "Clysmic Water," which are assessed at $622.50, this being the amount which the complainant would have received, if the same had been shipped from her spring. The decree will also provide that, in case of further violations of the contract or breaches of duty by the defendant Lockwood, the complainant will have leave by supplemental bill, or by original bill to be hereafter filed, as she may elect, to apply for relief in that behalf.

Mr. Justice HARLAN sat with the district judge on the hearing of this case, and concurred in the foregoing opinion.