MANITOU SPRINGS MINERAL WATER CO v. SCHUELER et al.

(Circuit Court of Appeals, Eighth Circuit. February 1, 1917.)

No. 4608.

1. TRADE-MARKS AND TRADE-NAMES ⬤═9—PROTECTION.

To entitle a name to equitable protection as a trade-mark, the right to its use must be exclusive, and not one which others may employ with as much truth as those who use it, even though the use by the second producer, in describing faithfully his product, of a name or combination already in use by another may have the effect of causing the public to mistake the origin or ownership of the product, and hence no one can apply geographical names to well-known articles of commerce so as to prevent others in the same territory from truthfully using the same designation.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 13.]

2. TRADE-MARKS AND TRADE-NAMES ⬤═3(3)—NATURE OF TRADE-MARK.

A trade-mark must, either by itself or by association. point distinctively to the origin or ownership of the article to which it is applied, and no one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by him.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 6.]

3. TRADE-MARKS AND TRADE-NAMES ⬤═66—RIGHT TO TRADE-MARK.

The first appropriator of a name or device pointing to his ownership, or which, by being associated with articles of trade, has acquired an understood reference to the originator, or manufacturer of the articles, is injured whenever another adopts the same name or device for similar articles, because such adoption is in effect a false representation that the productions of the latter are those of the former.

4. TRADE-MARKS AND TRADE-NAMES ⬤═9—GEOGRAPHICAL NAMES.

Where a geographical name acquires a secondary significance, indicative not only of the place of manufacture, but of the name of the manufacturer or producer, and the excellence of the thing manufactured or produced, an exclusive right to such name may be asserted as against every one not doing business within the same geographical limits, and even as against him if the name be used fraudulently to mislead buyers.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 13.]

5. TRADE-MARKS AND TRADE-NAMES ⬤═7—SUBJECT-MATTER—NATURAL PRODUCT.

One who owns and controls the source of a particular natural product, such as a spring of mineral water, is entitled to be protected in the name given to that product, provided it is one otherwise subject to exclusive appropriation as fully as in the case of any article, or artificial product of manufacture.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 11.]

6. TRADE-MARKS AND TRADE-NAMES ⬤═9—GEOGRAPHICAL NAMES—RIGHT TO.

A geographical name which for a long period has referred exclusively to a product made at the place and not to the place itself may be properly used as a trade-mark, and in such case, notwithstanding the manufacturer of the original product removed to another locality, he is entitled to retain the use of the name.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 13.]

7. TRADE-MARKS AND TRADE-NAMES ☞92—INFRINGEMENT—PLEADING—BILL.
   Inartificiality of statement in a bill to enjoin the infringement of a trade-mark will not justify dismissal of the bill in limine if a cause of action is substantially pleaded.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 102, 103.]

8. TRADE-MARKS AND TRADE-NAMES ☞21—RIGHT TO—PRIORITY.
   The exclusive right to the use of a mark or device claimed as a trade-mark is founded on priority of appropriation, although absolute priority, like that required of an inventor in a patent, is not necessary.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 24.]

9. TRADE-MARKS AND TRADE-NAMES ☞92—RIGHT TO—INFRINGEMENT.
   A bill, alleging that complainant's predecessors acquired possession of springs known from time immemorial as the "Manitou Springs," that being the Indian name thereof, that its predecessors and complainant long marketed the waters thereof under the name "Manitou," using such name as a trade-mark in connection with the words "Original Natural Mineral Ginger Champagne Bottled at the Famous Effervescent Springs Lying at the Foot of Pike's Peak, Colo. Manitou, Colo. U. S. A.," and that defendant acquired another spring, discovered in the same locality, but not in the same group, and disposed of its waters under the name "Manitou," sufficiently states a cause of action for equitable relief, particularly in view of the allegations of the registration of the trade-mark.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 102, 103.]

10. TRADE-MARKS AND TRADE-NAMES ☞9—REGISTRATION.
   Under Trade-Mark Act Feb. 20, 1905, c. 592, § 5, 33 Stat. 725 (Comp. St. 1913, § 9490), providing that nothing shall prevent the registration of any mark used by the applicant or his predecessors which was in actual exclusive use as a trade-mark of the applicant or his predecessors from whom he derived title for 10 years next preceding the act, complainant and its predecessors, having enjoyed an actual and exclusive use of a geographical name as a trade-mark for 10 years next preceding the passage of the act, is entitled on registration to protection, notwithstanding the name be regarded in a sense merely geographical.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 13.]

Appeal from the District Court of the United States for the District of Colorado; John A. Riner, Judge.

Bill by the Manitou Springs Mineral Water Company, a corporation, against J. Schueler and others, copartners doing business under the name and style of Ute Chief Mineral Water Company. From a decree dismissing the bill, complainant appeals. Reversed and remanded, with directions.

Ralph Hartzell, of Denver, Colo., for appellant.

Charles W. Waterman, of Denver, Colo. (Caldwell Martin, of Denver, Colo., on the brief, and John A. Gallaher, of Denver, Colo., of counsel), for appellees.

Before SANBORN, Circuit Judge, and TRIEBER and VAN VALKENBURGH, District Judges.

VAN VALKENBURGH, District Judge. Appellant, complainant below, is a corporation under the laws of Colorado. Appellees, de-

fendants below, are citizens and residents of the state of Colorado, and are copartners, under the firm name and style of the Ute Chief Mineral Water Company, with their principal place of business in the town of Manitou in said state. In its bill plaintiff states that:

It "is the owner and in possession of a large tract of land in the city of Manitou and state of Colorado, and of a certain group of large and valuable springs of mineral water situate upon said lands, which said group of springs are and from time immemorial have been known as 'Manitou Springs,' as will be hereinafter more particularly set forth. That plaintiff and its predecessors in interest have owned and been in possession of said tract of land and said springs for many years. That prior to the settlement and occupation of the region now known as the state of Colorado, the said group of springs had been discovered by the Indian races which then occupied said region, and that the Indians, in recognition of the agreeable, medicinal, and curative properties which the waters of said springs possessed, had given to said group of springs the name of 'Manitou' which is a word used in Indian mythology indicating the name of the Indian 'Great Spirit' or 'Deity.' This name so given to the said group of springs by the Indian races was made known to the first settlers and explorers of the region by the Indians, and the said group of springs retained the said name and was so denominated from that time forth until the present. That in due course the lands in said region were explored and settled upon by citizens of the United States, and the said tract of land embracing said group of springs was acquired by the first predecessors in interest of this plaintiff, and from the time of said first settlement upon said tract of land until the present date, the said group of springs has been called and known as 'Manitou Springs' and has been so known by the successive owners thereof and as well by the public at large. That at all of the times herein mentioned the waters of said springs have been known as 'Manitou Water,' and the said name has been exclusively applied to the waters produced from the said springs and to no other water. That soon after the settlement and occupation of the region now known as Colorado, the waters of said springs had acquired such a favorable renown for their agreeable, curative, and medicinal properties that the owners and proprietors thereof engaged in the business of bottling and vending the same to the public under the name of 'Manitou Water' and the successive owners of the said lands and springs have continued the said business from that time until the present day. That in the course of time and after many years occupied in settlement upon the lands now embraced within the state of Colorado and many years subsequent to the time when the said springs had become well known as the 'Manitou Springs,' and because of favorable climatic conditions in the region surrounding said springs, and because of the desire of many people to enjoy said climatic conditions and the benefits of residence in the neighborhood of the said springs, many people settled upon and took up their residence in such neighborhood, so that in the course of time a town was organized under the laws of Colorado, and to that town, because of its proximity to the said springs, was given the name of 'Manitou,' said name being given to the said town because of its proximity to the said group of springs, which, as is herein set forth, had for many years prior thereto carried the name of and been widely known by the public as 'Manitou Springs.' "

The bill then sets forth:

That plaintiff is now, and for many years past has been, engaged in the business of bottling, manufacturing, and selling the waters from said springs and products allied therewith; that said business has been conducted among the several states of the United States and in commerce with foreign nations; that in the conduct of said business plaintiff and its predecessors in interest have expended large sums of money in building, maintaining, and operating a large plant of buildings and machinery upon said lands, in advertising said waters and allied products, and in establishing and maintaining sales agencies therefor; that by reason of the premises the plaintiff and its predecessors have built up a large and profitable business; that at all times they have

continuously called said waters by the name "Manitou" and have used said name upon all bottles containing said waters and products from said springs; that said name thereby has become widely and favorably known to merchants in and consumers of mineral water and allied products throughout the United States.

"That for many years past plaintiff's predecessors in interest had adopted and used as the trade-mark of the waters from said springs and the allied products, the word 'Manitou,' which trade-mark was in actual and exclusive use as a trade-mark in interstate commerce by plaintiff's predecessors in interest, from whom plaintiff derived title, for more than ten years next preceding February 20, 1905. That plaintiff's predecessors in interest the Manitou Mineral Springs Company, pursuant to the laws of the United States in that behalf, on, to wit, the 19th day of December, 1905, secured from the United States Patent Office, registration of its said trade-mark, consisting of the word 'Manitou' for its exclusive use in the manufacturing and vending of the mineral water and products of its said springs."

That on the 5th day of December, 1913, this plaintiff acquired said properties and business, together with said trade-mark used in connection therewith, and is now the sole owner and proprietor thereof.

"That many years after the discovery of and settlement upon and around the group of springs known as 'Manitou Springs,' and many years subsequent to the time when the waters from the said Manitou Springs had become widely and favorably known in commerce among the several states and to consumers and to the public generally under the name of Manitou, and many years subsequent to the adoption and use of the said name 'Manitou' by plaintiff's predecessors in interest as the trade-mark of the waters from the said Manitou Springs, a certain spring of water was discovered near the town of Manitou, Colo., and to the said spring the discoverers thereof gave the name 'Ute Chief Spring.' That the said last-named spring was and is entirely distinct and apart from the said group of springs now owned by the plaintiff, and known, and herein referred to, as 'Manitou Springs' or any thereof, and that the waters of the said so-called Ute Spring are entirely different in quality and properties from the waters of the said Manitou Springs. That after the discovery of the said Ute Spring, and as plaintiff is informed and believes, about the year 1902, the defendants acquired title to the waters of the said Ute Spring. And thereafter the said defendants, against the protest and warning of plaintiff's predecessors in interest and in violation of the rights of plaintiff's predecessors in interest to the exclusive use of the said trade-mark, and without license or permission from plaintiff's predecessors in that behalf, undertook to and did and do now use the word 'Manitou' upon labels affixed to bottles of mineral water prepared, manufactured, and sold by the said defendants, and did and do now counterfeit and colorably imitate plaintiff's said trade-mark thereon."

Thereafter follow more specific allegations as to the infringement complained of and a prayer for injunctive and other equitable relief.

Adopting the foregoing quoted averments, a second count declares upon a trade-mark registered June 12, 1906, consisting of a device—

"wherein appears the bust representation of an Indian rising above clouds, with the setting sun as a background, and holding in one hand a glass and in the other a pipe, a scene showing a house, a well curb, a rock, trees, people in the foreground and mountain peaks in the background, the word 'Manitou' inclosed in quotation marks, the words 'Original Natural Mineral Ginger Champagne Bottled at the Famous Effervescent Springs lying at the Foot of Pike's Peak, Colo. Manitou, Colo. U. S. A. The only Water on the American Continent Recharged with its Own Gas. Keep Bottle in Cool Place and Lay on its Side.'"

A third count deals with a trade-mark, registered on the same date as that next preceding, for the same device except that the words "Table Water" are substituted for "Ginger Champagne." A fourth

cause of action counts upon a trade-mark registered October 9, 1906, covering the words "Manitou Table Water." A fifth count concerns a trade-mark, registered upon the same date last mentioned, consisting of the words "Manitou Ginger Champagne." A sixth count covers the word "Manitou" alone, registered as a trade-mark January 8, 1907. The defendants are charged with infringement of all these marks. A seventh cause of action is for unfair competition in trade in connection with the infringements aforesaid.

The defendants moved to dismiss this bill, and each count thereof, alleging that the district court was without jurisdiction and the bill without equity. This motion was sustained, and plaintiff brings its appeal to this court. As stated by counsel for appellees:

"The motion to dismiss the amended bill of complaint raised the following propositions: First, that the alleged trade-marks were invalid at common law; secondly, that no facts were alleged which brought the case within the 10-year proviso of the fifth section of the Trade-Mark Act of 1905; thirdly, that no facts were alleged showing any infringement of a trade-mark; and lastly, that no facts were alleged showing unfair trade."

The first of these points involves the contention that the word "Manitou," which forms the basis of the trade-marks in suit, is a geographical name not the subject of a valid trade-mark.

[1-3] The following general propositions of law may be taken as established: To entitle a name to equitable protection as a trade-mark, the right to its use must be exclusive, and not one which others may employ with as much truth as those who use it. And this is so although the use by a second producer, in describing truthfully his product, of a name or a combination of words already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product. Hence no one can apply the name of a district or country to a well-known article of commerce, and obtain thereby such an exclusive right to the application as to prevent others inhabiting the district or dealing in similar articles coming from the district, from truthfully using the same designation. The trade-mark must either by itself or by association point distinctively to the origin or ownership of the article to which it is applied. The reason of this is that unless it does, neither can he who first adopted it be injured by any appropriation or imitation of it by others, nor can the public be deceived. The first appropriator of a name or device pointing to his ownership, or which, by being associated with articles of trade, has acquired an understood reference to the originator, or manufacturer of the articles, is injured whenever another adopts the same name or device for similar articles, because such adoption is, in effect, representing falsely that the productions of the latter are those of the former. The trade-mark must therefore be distinctive in its original signification, pointing to the origin of the article, or it must have become such by association. No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself. As its office is to point out distinctively the origin or ownership of the articles to which it is affixed, no sign or form of words can be ap-

propriated as a valid trade-mark, which from the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right for the same purpose.

These principles are announced in the following cases decided by the Supreme Court of the United States, from whose opinions the foregoing statements are substantially quoted. Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, 37 L. Ed. 1144; Elgin Watch Co. v. Illinois · Watch Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365. It is upon these cases that appellees rely chiefly to support their position in the point now under discussion. Many other decisions in various jurisdictions are to the same effect, but the complete doctrine will be found comprehensively and elaborately announced in the three cases cited.

In Canal Company v. Clark the word "Lackawanna," as applied to coal, was claimed to be the peculiar property and trade-mark of the complainants. The court found that this word was not devised by the complainants; that they found it a settled and known appellative of the district in which their coal deposits and those of others were situated; that at the time when they began to use it, it was a recognized description of the region and of the earths and minerals in the region. The court further said:

"It may be observed there is no averment that the other coal of the Lackawanna Valley differs at all in character or quality from that mined on the complainants' lands. On the contrary, the bill alleges that it cannot easily be distinguished therefrom by inspection. The bill is therefore an attempt to secure to the complainants the exclusive use of the name 'Lackawanna coal,' as applied, not to any manufacture of theirs, but to that portion of the coal of the Lackawanna Valley which they mine and send to market, differing neither in nature nor quality from all other coal of the same region. * * * The defendant has advertised for sale, and he is selling coal not obtained from the plaintiffs, not mined or brought to market by them, but coal which he purchased from the Pennsylvania Coal Company, or from the Delaware, Lackawanna & Western Railroad Company. He has advertised and sold it as Lackawanna coal. It is in fact coal from the Lackawanna region. It is of the same quality and of the same general appearance as that mined by the complainants. It is taken from the same veins or strata. It is truly described by the term 'Lackawanna coal,' as is the coal of plaintiffs. The 'description does not point to its origin or ownership, nor indicate in the slightest degree the person, natural or artificial, who mined the coal or brought it to market."

The bill was accordingly dismissed.

In Columbia Mill Co. v. Alcorn the word "Columbia" was adjudged not to be the subject of exclusive appropriation, having been in common use long prior to its adoption by complainant and giving no information by association, prior use, or otherwise, on the subject of origin, production, or ownership.

In Elgin Watch Co. v. Illinois Watch Co., complainant had established a watch factory in the city of Elgin, Ill., and was attempting to appropriate the name of that city to its exclusive use as a technical trade-mark. It appeared that primarily the word simply described the place of manufacture, and in no sense pointed to origin, production or ownership. The decree dismissing the bill was accordingly affirmed.

A situation altogether similar is disclosed in Castner v. Coffman, 178 U. S. 168, 20 Sup. Ct. 842, 44 L. Ed. 1021, in which it was sought to appropriate the name "Pocahontas" as applied to coal. This name was not used until a town was incorporated under that name. The court said:

"In passing, it is proper to notice that the fact that the coal mined in the various collieries in operation at the date of this agreement, as is the case with the mines now being operated, was from the same seam as that mined at the original Pocahontas mines."

It further appeared that there was no evidence of any want of knowledge on the part of complainants of the designation "Pocahontas" as the name of the coal mined in any and all of the collieries in operation in that region, and that the advertisement of the complainants made it clear that they were offering for sale, not the particular product of any one mine, but that the Pocahontas coal which they advertised was derived from numerous collieries within the Pocahontas region.

In John T. Dyer Quarry Co. v. Schuylkill Stone Co. (C. C.) 185 Fed. 557, the principle involved is further illustrated. The stone, quarried, crushed, and sold by complainant at Birdsboro, Berks county, Pa., was of igneous origin, commonly known as trap rock, and obtained from a dike of several miles in extent. The court said:

"Neither Dyer nor his successors owned or leased the entire dike. No reason is perceived why other persons quarrying, crushing, and selling the stone from the same dike should not, in the absence of fraud or unfair competition in trade, be permitted to use, in connection with the business carried on by them, the words peculiarly appropriate to the stone in that dike by whomsoever quarried. Especially is this true in view of the fact that, unlike manufactured articles dependent for their excellence upon care and skill observed in their production, the quality of trap rock, like many other natural products, vegetable and mineral, largely depends upon the locality where found."

[4] It is, however, uniformly recognized that geographical names often acquire a secondary signification, indicative not only of the place of manufacture, but of the name of the manufacturer or producer, and the excellence of the thing manufactured or produced, which enables the manufacturer or owner to assert an exclusive right to such name as against every one not doing business within the same geographical limits; and even as against them, if the name be used fraudulently for the purpose of misleading buyers as to the actual origin of the thing produced or palming off the productions of one person as those of another. French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247, and numerous decisions.

It will be noted that the prohibition against exclusive appropriation is confined to a name which is, in the language of the statute, "merely geographical," and "which, from the fact conveyed by its primary meaning, others may employ with equal truth and with equal right for the same purpose."

[5] It may also be laid down, upon reason and authority, that one who owns and controls the source of a particular natural product, such as a spring of mineral water, is entitled to be protected in the name given to that product, provided it is one otherwise subject to

exclusive appropriation as fully and as completely as in the case of any artificial product of manufacture. Congress Spring Co. v. High Rock Spring Co., 45 N. Y. 295–300, 6 Am. Rep. 82; Appollinaris Co. v. Sherer (C. C.) 27 Fed. 18; Hill v. Lockwood (C. C.) 32 Fed. 389; City of Carlsbad et al. v. Thackeray & Co. (C. C.) 57 Fed. 18; City of Carlsbad et al. v. Kutnow et al., 71 Fed. 167, 18 C. C. A. 24; Northcutt v. Turney, 101 Ky. 314, 41 S. W. 21; Dunbar v. Glenn, 42 Wis. 118, 24 Am. Rep. 395.

[6] This brings us to a very important distinction or exception in the application of the doctrine under discussion. It has been held in Baglin v. Cusenier Co., 221 U. S. 580, 31 Sup. Ct. 669, 55 L. Ed. 863, that while names which are merely geographical cannot be exclusively appropriated as trade-marks, a geographical name which for a long period has referred exclusively to a product made at the place, and not to the place itself, may properly be used as a trade-mark, and in such case that a validly registered trade-mark cannot be used by any one other than the owner, even with words explaining that the article to which it is attached is not manufactured by the owner of the trade-mark. The facts concerning the origin of the trade-mark there under consideration are thus stated:

"The facts, so far as we deem it necessary to state them, are as follows: For several hundred years prior to 1903—save for a comparatively brief period following the French Revolution—the Order of Carthusian Monks occupied the Monastery of the Grande Chartreuse, near Voiron, in the Department of Isere, in France. This was their Mother House. There, by a secret process, they made the liqueur or cordial which, at first sold locally, became, upwards of 50 years ago, the subject of an extensive trade and is known throughout the world as 'Chartreuse.' The Monks originally manufactured the liqueur at the Monastery itself and later at Fourvoirie, close by. It was marketed, here and abroad, in bottles of distinctive shape, to which were attached labels bearing the inscription, 'Liqueur Fabriquée a la Gde. Chartreuse,' with a facsimile of the signature of L. Garnier, a former Procureur of the Order, and its insignia, a globe, cross and seven stars; and these symbols with 'Gde. Chartreuse' underneath were also ground into the glass. In 1876, the then Procureur registered two trade-marks in the Patent Office, and these were re-registered in 1884, under the act of 1881. In the accompanying statement the one was said to consist 'of the word "Chartreuse," accompanied by a facsimile of the signature of L. Garnier,' and the other 'of the word symbol "Chartreuse"'; and the combinations in which these were used were described. In the year 1903, having been refused authorization under the French law of July 1, 1901, known as the Associations Act, the congregation of the Chartreux was held to be dissolved by operation of law, and possession was taken of their properties in France by a 'sequestrating administrator and liquidator' appointed by the French court. Forcibly removed from their former establishment, and taking their secret with them, the Monks set up a factory at Tarragona, in Spain, and there according to their ancient process they have continued the manufacture of the liqueur, importing from France such herbs as were needed for the purpose."

In his opinion Mr. Justice Hughes thus discusses the point now under consideration:

"It is insisted that the judgment is erroneous in determining that 'the word symbol Chartreuse' constituted a valid trade-mark. It is argued that 'Chartreuse' is a regional name; that the characteristic qualities of the liqueur were due to certain local advantages by reason of the herbs found and cultivated within the district described; that even as used in connection with the Monks'

liqueur it was still a description of place; and hence, that at most, so far as this word is concerned, the question could be one only of unfair competition. The validity of this argument cannot be admitted upon the facts which we deem to be established and controlling. It is undoubtedly true that names which are merely geographical cannot be the subject of exclusive appropriation as trade-marks. 'Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies.' Canal Company v. Clark, 13 Wall. 324 [20 L. Ed. 581]. See, also, Columbia Mill Company v. Alcorn, 150 U. S. 460 [14 Sup. Ct. 151, 37 L. Ed. 1144]; Elgin National Watch Company v. Illinois Watch Company, 179 U. S. 665 [21 Sup. Ct. 270, 45 L. Ed. 365]. This familiar principle, however, is not applicable here. It is not necessary for us to determine the origin of the name of the Order and its chief Monastery. If it be assumed that the Monks took their name from the region in France in which they settled in the Eleventh Century, it still remains true that it became peculiarly their designation. And the word 'Chartreuse' as applied to the liqueur which for generations they made and sold cannot be regarded in a proper sense as a geographical name. It had exclusive reference to the fact that it was the liqueur made by the Carthusian Monks at their Monastery. So far as it embraced the notion of place, the description was not of a district, but of the Monastery of the Order—the abode of the Monks—and the term in its entirety pointed to production by the Monks. * * * It could not fail to be recognized at once that these were the distinctive designations of the liqueur made by the Monks, and not geographical descriptions available to any one who might make cordial in a given section of country."

The distinguishing feature thus pointed out is recognized in the opinion of the Circuit Court of Appeals for the Third Circuit in Apollo Bros. et al. v. Perkins, 207 Fed. 530–533, 125 C. C. A. 192, 195.

" 'Nubia,' it is admitted, is a geographical name, and there is nothing in the circumstance of its selection or use by the complainant (such as was found in Baglin v. Cusenier Co., 221 U. S. 580, 31 Sup. Ct. 669, 55 L. Ed. 863) that would permit of its registration under the Trade-Mark Act (33 Stat. 725, U. S. Comp. St. Supp. 1911, p. 1461), section 5 of which denies registration to marks which consist of 'merely a geographical name or term.' "

The deductions to be drawn from the decided cases are that geographical names are excluded only when they are merely such and are not selected, used, and appropriated under such special circumstances as to point distinctively to origin or ownership. Importance attaches to the fact conveyed by its primary meaning, whether the term in its entirety embraces primarily the notion of place or a distinctive designation of origin and ownership. It appears that the latter signification may, under certain conditions, be the primary one, even though the name was geographical and regional at the time of adoption as a trademark, and still more would this be true if the geographical or regional sense came into being after such adoption and use, whether technical or otherwise.

It is true that in Glendon Iron Co. v. Uhler, 75 Pa. 467, 15 Am. Rep. 599, the borough of Glendon was established after the adoption of the word "Glendon" as a trade-mark. The exclusive appropriation of that word was denied as a geographical term. This case is cited apparently with approval in Columbia Mill Co. v. Alcorn, supra; but the cases of Canal Company v. Clark, Columbia Mill Co. v. Alcorn, and Elgin National Watch Co. v. Illinois Watch Company, were all

cited and considered in Baglin v. Cusenier Co., and the unanimous con-
clusion of the Supreme Court in the last-named case was not deemed
to be in conflict with the principle announced in the previous deci-
sions of that court.

[7-9] It should be noted that all the leading cases, to which refer-
ence has been made, were decided upon a full presentation of essential
facts. In the case at bar, we are confined to the allegations of the
amended bill, and, without losing sight of the accepted rule of construc-
tion against the pleader, nevertheless inartificiality of statement should
not justify summary action in limine, if a cause of action is substan-
tially pleaded. The complainant has stated the origin of the trade-
mark claimed in terms sufficient to demand consideration, upon fuller
showing, of whether or not this case falls within the exception rather
than the general rule governing the status of geographical names as
technical trade-marks. It has alleged appropriation of this mark with
such legal sufficiency as to forbid arbitrary rejection upon the face
of the bill. As was said in Columbia Mill Company v. Alcorn, supra:

"The exclusive right to the use of a mark or device claimed as a trade-
mark is founded on priority of appropriation, and it must appear that the
claimant of it was the first to use or employ it on like articles of production."

But it is held that this does not mean absolute priority like that
required of an inventor in a patent under an absolute statute. The
doctrine of prior use does not apply with equal force in trade-mark
cases, because the exclusive right to the use of a trade-mark.rests not
on invention, but on such use as makes it point out the origin of the
claimant's goods. It must be early enough for that, but absolute pri-
ority or invention is not required. Jacoway v. Young, 228 Fed. 630,
143 C. C. A. 152. We believe the state of facts tendered by the bill is
sufficient to entitle complainant to exhibit its proofs in support of its
claim of technical trade-mark in the word "Manitou" standing alone
or in combination.

[10] We have thus far considered only the first proposition raised
by the motion to dismiss. In view of the conclusion reached a passing
reference will suffice for the others. We deem it unnecessary to de-
cide whether the facts alleged bring the case within the ten-year pro-
viso of the fifth section of the Trade-Mark Act of 1905. It is proper
to say, however, that if, upon sound pleading, complainant can show
an actual and exclusive use of this word as a trade-mark of itself or
its predecessors, from whom it derived title, for ten years next pre-
ceding the passage of the act of 1905, it will be entitled to protection
accordingly, even though the word "Manitou" be regarded as used in
a sense merely geographical. Rossman v. Garnier, 211 Fed. 401, 128
C. C. A. 73; Thaddeus Davids Co. v. Davids Manufacturing Co., 223
U. S. 733, 32 Sup. Ct. 528, 56 L. Ed. 635.

While the allegations respecting infringement and unfair trade might
be measurably amplified with a possible gain in definiteness and cer-
tainty, nevertheless we by no means consider them fatally defective
upon motion to dismiss. Since appropriate action in the trial court,
if thought advisable, may remove all substantial ground for criticism

in this respect, we deem further discussion of these features unnecessary at this time. The decree is accordingly reversed, and the cause remanded to the court below, with directions that defendants be permitted to make their answer to the bill, and for such other and further proceedings thereafter as equity may demand and permit. It is so ordered.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes