SCANDINAVIA BELTING CO. v. ASBESTOS & RUBBER WORKS OF AMERICA, Inc. *

(Circuit Court of Appeals, Second Circuit. March 3, 1919.)

No. 49.

1. TRADE-MARKS AND TRADE-NAMES ☞97—NATURE—RIGHT TO INJUNCTION.
   The right to a trade-mark is a property right entitled to the same protection as any other property right, and equity can restrain the use of such trade-mark by another under its power to protect property from irreparable damage.

2. TRADE-MARKS AND TRADE-NAMES ☞1, 3(2, 4), 7—"TRADE-MARK"—DESCRIPTIVE WORDS.
   A word merely descriptive of an article or the current name of an article, or of a general character of a business, cannot be used as a "trade-mark," which is a mark or symbol used by one who manufactures or sells goods to distinguish them from similar goods manufactured or sold by another.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Trade-Mark.]

3. TRADE-MARKS AND TRADE-NAMES ☞9—GEOGRAPHICAL NAMES.
   A geographical name which does not indicate the origin or ownership of the goods and can be truthfully used by any other manufacturer or trader

---

of the same locality cannot be a common-law trade-mark, unless there is no other who can truthfully use the name, or unless from the name, as applied to the article, it is manifest that it is used in a purely arbitrary sense.

4. **TRADE-MARKS AND TRADE-NAMES** ☜67—**UNFAIR COMPETITION—USE OF GEOGRAPHICAL NAME.**

Where a geographical name originally used to indicate place of origin has acquired a secondary significance, indicating the name of the manufacturer or seller, and the excellence of the thing made or sold, it does not thereby become a common-law trade-mark, but its unfair use by others to deceive the public as to the origin or ownership of goods may be restrained as unfair competition.

5. **TRADE-MARKS AND TRADE-NAMES** ☜9—**GEOGRAPHICAL NAMES—DESCRIPTIVE MEANING.**

The word "Scandinavia" applied to the belting of a particular manufacturer is a descriptive geographical name, which cannot be a common-law trade-mark, though the belting is made in England; since it does not appear from the name itself that it is not the designation of the place of manufacture.

6. **TRADE-MARKS AND TRADE-NAMES** ☜45—**REGISTRATION—EFFECT.**

The registration of a trade-mark under Act Feb. 20, 1905 (Comp. St. §§ 9485–9511, 9513–9516), does not validate a trade-mark not previously valid, unless the trade-mark comes within the provision for the registration of any trade-mark exclusively used for ten years.

7. **TRADE-MARKS AND TRADE-NAMES** ☜21—**USE IN FOREIGN COUNTRY.**

The use of a word as a trade-mark for a particular kind of belting manufactured in a foreign country does not preclude the courts of this country from protecting the trade-mark in so far as the goods to which it applied were sold here.

8. **TRADE-MARKS AND TRADE-NAMES** ☜43—**REGISTRATION—"OWNER."**

A corporation, to whom a foreign manufacturer had agreed to sell its products exclusively in this country and to give exclusive use of its trade-mark for a period longer than the period of registration, is an "owner" of the trade-mark entitled to register it under Act Feb. 20, 1905 (Comp. St. §§ 9485–9511, 9513–9516), the word "owner" in statutes being given a varied significance according to the context, and, even if the corporation is an agent of the manufacturer, it is an agent with an interest and a special owner entitled to the benefit of the act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Owner.]

9. **STATUTES** ☜184—**CONSTRUCTION—PURPOSE.**

Statutes are to be given a rational and sensible construction, in view of the object sought to be obtained and the evil to be remedied.

10. **TRADE-MARKS AND TRADE-NAMES** ☜43—**REGISTRATION—GEOGRAPHICAL NAMES—EXCLUSIVE USE.**

One who had exclusively used the word "Scandinavia" as his trade-mark for belting since 1892 is entitled, under the provision of the act of February 20, 1905 (Comp. St. §§ 9485–9511, 9513–9516), that nothing in the act should prevent the registration of a mark used exclusively as a trade-mark for more than 10 years preceding the act, to register it as a trade-mark; though it is a geographical word which could not be a trade-mark at common law.

11. **TRADE-MARKS AND TRADE-NAMES** ☜85(1)—**UNFAIR COMPETITION—DEFENSES—ATTEMPT TO REGISTER.**

An attempt to register a trade-mark by one who was not the owner is not a fraud which bars the user's remedy for unfair competition, where he acted on a mistaken view of the law honestly entertained.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

12. TRADE-MARKS AND TRADE-NAMES ⬳85(1)—UNFAIR COMPETITION—DE-
FENSES—FRAUD OF PLAINTIFF.

The use of the word "Scandinavia" as a trade-mark for belting manu-
factured in England by the successors of one who had previously worked
in Sweden is not a fraud, which prevents the owners of the trade-mark
from seeking relief in equity; there being no evidence of intention to
deceive or of deception as to the place of manufacture.

13. TRADE-MARKS AND TRADE-NAMES ⬳11—EXTINGUISHMENT—USE WITH
PATENTED ARTICLE.

The use of the word "Scandinavia" as a trade-mark of a patented
belting does not give the public the right to use the trade-mark after the
expiration of the patent, in the absence of evidence that the manufactur-
er had expressly or impliedly consented that such word should become
the descriptive generic name of the article patented.

14. TRADE-MARKS AND TRADE-NAMES ⬳45—REGISTRATION—NAME OF PAT-
ENTED ARTICLE.

The failure of the public to use the trade-mark of a patented article
after the expiration of the patent, until after the trade-mark had been
registered under the 10-year clause of the act of February 20, 1905 (Comp.
St. §§ 9485-9511, 9513-9516), prevents the use of such trade-mark there-
after by any one but the owner.

15. TRADE-MARKS AND TRADE-NAMES ⬳70(3)—UNFAIR COMPETITION—IMITA-
TION OF TRADE-MARK.

Where it was shown that the term "Scandinavia" applied to belting
was understood to mean plaintiff's product, in which it had built up a
large business, and that defendant, in response to requests for such belt-
ing, had put out a product similar in appearance and designated as "Scan-
dinavian belting," complainant was entitled to an injunction to restrain
unfair competition.

16. TRADE-MARKS AND TRADE-NAMES ⬳66—INFRINGEMENT OF TRADE-MARK
—LOSS TO PLAINTIFF.

The owner of a registered trade-mark can restrain its use by another,
though no loss of sales is shown and there may be no fraud between
the original seller and buyer of the infringing article.

17. TRADE-MARKS AND TRADE-NAMES ⬳69, 93(1)—UNFAIR COMPETITION—
PROOF OF FRAUD.

Actual fraud must be shown in a suit to restrain unfair competition,
but the simulation of well-known and distinctive features of complainant's
goods may be so close that the court can assume an intent to defraud.

Appeals from the District Court of the United States for the South-
ern District of New York.

Suit by the Scandinavia Belting Company against the Asbestos &
Rubber Works of America, Incorporated, for an injunction to restrain
the use of a trade-mark and unfair competition. From a decree de-
nying complainant's right to a trade-mark, but granting injunction on
the ground of unfair competition, both complainant and defendant ap-
peal. So much of the decree as dismissed the cause of action as to
the trade-mark reversed, with directions to sustain the trade-mark, and
decree, as modified, affirmed.

This cause comes here on appeal from the United States District Court for
the Southern District of New York.

The plaintiff is a corporation organized and existing under the laws of the
state of Maine and has its principal place of business in the borough of Man-
hattan in the city of New York. It is engaged in the business of selling
throughout the United States woven textile belting known in the trade as
"Solid Woven Belting." The largest part of the plaintiff's goods are sold by it

under the trade-mark "Scandinavia," of which trade-mark it claims the ownership within the United States. The belting which the plaintiff sells is manufactured for it in England by the Scandinavia Belting, Limited, a British corporation.

The plaintiff's trade-mark is registered in the plaintiff's name in the Patent Office of the United States under the act of Congress of February 20, 1905.

It is alleged that because of the great use by the public of the plaintiff's belting, and because of the information the plaintiff has conveyed to the public regarding its belting and trade-mark, the trade-mark "Scandinavia" has come to mean the particular belting manufactured for and sold by the plaintiff.

The defendant is a corporation organized and existing under the laws of the state of New York and has its principal place of business in the borough of Manhattan in the city of New York. It is engaged in the manufacture of belting and manufactures a brake band lining for automobiles. It is using the words "Scandinavian Woven Lining," "Ford Scandinavian Woven Lining," and "Ford Scandinavian Brake Lining" to designate its brake linings.

The plaintiff alleges that defendant's goods are a cheap imitation of the plaintiff's, and that, closely resembling them in outward appearance, they are of a greatly inferior quality, and are sold at a less price than the plaintiff's goods.

The plaintiff alleges that defendant fraudulently adopted the word "Scandinavian" for the purpose of inducing the public to purchase defendant's belting in the belief that it is the belting of the plaintiff, the belting of both being sold and used for the same purpose; and that defendant willfully adopted such name for the purpose of defrauding the public and the plaintiff, selecting such name because the name itself would mislead and deceive the public into purchasing and using defendant's belting under the mistaken belief that the same was the product of the plaintiff, and for the purpose of thereby depriving plaintiff of its lawful rights under its trade-mark, and in infringement of plaintiff's rights, both at common law and under its registered trade-mark; and that the said acts of defendant tend to deceive and have actually deceived the public and led it to believe that the belting so sold by the defendant under the name Scandinavia or Scandinavian is that originating with the plaintiff.

The plaintiff asks for an accounting of the profits and for damages and for an injunction.

The decree dismissed the cause of action as to the registered trade-mark holding the registration invalid; and it dismissed the cause of action as to the common-law trade-mark on the ground that the word "Scandinavia" is a geographical word and therefore cannot be acquired as a common-law trade-mark. The decree, however, sustained the cause of action as to unfair competition, and it directed that a perpetual injunction issue directing the defendant to desist:

"(a) From manufacturing, billing, cataloguing, selling, offering for sale or advertising belting or brake lining, not of plaintiff's manufacture, under the names or designations 'Scandinavian Woven Lining,' 'Ford Scandinavian Woven Lining,' 'Ford Scandinavian Brake Lining,' 'Scandinavian Weave,' 'Scandinavian Woven Type,' 'Scandinavian' and the abbreviated form of the word 'Scandinavian,' to wit, 'Scand,' or under any of such names or designations, or under any word or words of like import, and from using or causing to be used orally or in written or printed matter or in any bills or correspondence such names or designations, or any of them, for belting or brake lining, not of plaintiff's manufacture, and from causing confusion in the trade by any false use or imitation of plaintiff's trade-name 'Scandinavia,' calculated to mislead or deceive. And

"(b) from manufacturing, billing, cataloguing, putting up, selling, offering for sale, disposing of or advertising cartons or packages containing brake lining or belting and bearing the name 'Scandinavia' or 'Scandinavian,' or any imitation thereof, or word of like import, and particularly cartons like the carton identified as plaintiff's Exhibit No. 14, carton containing brake lining

of defendant sold under the name 'Scandinavian Woven Type,' and from disposing of all cartoons like plaintiff's Exhibit No. 14."

The decree also directed that plaintiff recover any and all profits accruing from defendant's violation of plaintiff's equitable rights and referred the same to a master to state an account of the damages and profits.

Both parties have appealed to this court.

William A. Redding and Nicholas M. Goodlett, both of New York City, for plaintiff.

Munn, Anderson & Munn, of New York City (T. Hart Anderson, of New York City, of counsel), for defendant.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This suit is brought in an attempt to secure to the plaintiff the exclusive use of the name "Scandinavia" as applied to belting. The plaintiff claims that it has a trade-mark in that name, both by virtue of the common law and by the registration of the name under the act of Congress providing for the registration of trade-marks.

[1] It has been said frequently that the doctrine of exclusive property in trade-marks has prevailed from the time of the Year Books. But an examination of the record hardly justifies the statement, in the opinion of Mr. Upton, who nevertheless declares that—

"Property in trade-marks, exclusive and absolute, has existed and been recognized as a legal possession, which may be bought and sold and transmitted, from the earliest days of our recorded jurisprudence." Upton on Trade-Marks, p. 10.

However early property in trade-marks may have been recognized, it is only in comparatively recent times that courts of equity have interfered by injunction for its protection. For in Blanchard v. Hill, 2 Atkyns, 484, in 1742, an application was made to Lord Chancellor Hardwicke for an injunction to restrain the defendant from making use of the Great Mogul as a trade-mark upon cards. The Lord Chancellor declared:

"There is no foundation for this court to grant such an injunction. Every particular trader has some particular mark or stamp; but I do not know any instance of granting an injunction here, to restrain one trader from using the same trade-mark with another; and I think it would be of mischievous consequence to do it."

But it is now and for many years has been well-established doctrine that the exclusive property of a proprietor of a trade-mark by virtue of the manufacture or offering for sale of his goods is entitled to the protection which the highest powers of the courts can afford. And the power of the court in such cases is exercised, not only to do individual justice, but to safeguard the interests of the public by preventing one's passing off his goods as the goods of another. The right of property in trade-marks has come to be recognized as of immense and incalculable value. Trade-marks, it has been truthfully said, are the only means by which the manufacturer and the merchant are enabled to inspire and retain public confidence in the quality and integ-

rity of things made and sold, and the only means by which the public is protected against the frauds and impositions of the crafty and designing who are always alert to appropriate to themselves the fruits of the reputation of others.

The jurisdiction of an equity court to restrain by injunction the passing off by A. of his own goods as being the goods of B. is in aid of the legal right and is founded on the equity of protecting property from irreparable damage. In such a case, the court acts on the same principles upon which it interferes in other cases in protecting legal rights to property. Kerr on Injunctions, p. 357.

The court below has held that the plaintiff is entitled to an injunction, but that it is entitled to it on the ground of unfair competition, and not because it has a trade-mark which has been infringed.

[2] The law recognizes the right of every one who manufactures or sells goods to affix to them a mark or symbol which may distinguish them from similar goods manufactured or sold by another. The mark or symbol so used is known as a "trade-mark." While any name, symbol or emblem may in general be a trade-mark, yet the law does not allow a word to be so used which is merely descriptive of an article, or which is the current name of an article, or which merely denotes the general character of a business. And one of the questions raised in the case now under consideration is whether the word "Scandinavia" used by the plaintiff as a trade-mark is one which can be so employed.

[3] In 38 Cyc. 722, it is said that—

"Geographical terms and words in common use to designate a locality, a country, or a section of a country cannot be monopolized as trade-marks. In some cases geographical names have been, protected nominally upon the ground of trade-mark, but these cases must be supported, if at all, upon the ground of unfair competition."

In 28 Am. & Eng. Encyc. of Law, 377, the rule is stated as follows:

"It is well settled that a geographical term, by which is meant a term denoting locality, cannot be exclusively appropriated as a trade-mark or trade-name, because such a term is generic or descriptive, and any one who can do so truthfully is entitled to use it. Geographical terms may, however, by long and exclusive user acquire a secondary significance as denoting the goods or business of the particular trader who has so used them, and under such circumstances a subsequent trader will not be permitted to use such terms in a manner that will be likely to deceive the public, and pass off his goods or business as being the goods or business of his rival, for this would constitute unfair competition."

In Browne on Trade-Marks the law is thus stated:

"Sec. 182. *Geographical Names.*—Instances are not rare where these have been sustained as technical trade-marks. But in every case of the adoption of the name of a country, nation, region, or place, such name has been used in an arbitrary sense, and not adjectively; except where the owner of the mark was also sole possessor of the place of origin, or had the monopoly of the vendible product, as for example, of a mineral spring, or an established place of manufacture. Under circumstances of an exclusive right of sale, such a name cannot be said to be merely geographical. To be such, all or many others than the claimant, should have a right equal to his own to apply a trade-mark."

The House of Lords in 1872 decided the well-known case of Wotherspoon v. Currie, L. R. 5 H. L. Eng. & Ir. App. Cases, 508. In that case a bill had been filed to enjoin the respondent from using the geographical name "Glenfield" in connection with the manufacture of starch. The complainants had formerly carried on the business of starch makers at Glenfield which was a small place, not even a hamlet, in the neighborhood of Paisley in Scotland. The starch they manufactured was commonly known as "Glenfield Starch." The business was, after some years, removed to a larger place called "Maxwelltown," which was also near Paisley, and the starch there manufactured continued to be sold as "Glenfield Starch." The respondent had for many years lived at Glenfield, but had carried on his business of manufacturing starch in his works at Paisley. Some time after the complainant's removal of his business from Glenfield to Maxwelltown, the respondent began making starch in Glenfield, calling his product "Glenfield Starch," and selling it under that name in Scotland and in England. The respondent's label stated that it was manufactured by "Currie & Co.," and the complainant's label stated that its starch was manufactured by "Robert Wotherspoon & Co." The suit was brought on the theory that the geographical name "Glenfield" had become the trade-mark of the complainant's business, and that, although the complainant had ceased to manufacture his product in Glenfield, he was entitled to restrain the respondent from using the same trade-mark, although the respondent actually made his starch in Glenfield. The House of Lords, reversing the court below, granted the injunction and restrained the respondent from using the word "Glenfield" in or upon any labels affixed to his packets of starch, and from in any other way representing the starch manufactured by or for him to be "Glenfield Starch." It is not suggested in any of the opinions delivered in the House of Lords that a trade-mark could not be had in a geographical name. Lord Chelmsford in the course of his opinion puts the question involved in this way:

"Has the respondent then been proved to have infringed the appellant's trade-mark within the established principle?"

And Lord Westbury in his opinion states that the word "Glenfield" had acquired a secondary meaning and had become "the trade denomination" of the starch made by the appellant, and he declares that the case comes within the principle that a party should be prevented from fraudulently availing himself of the trade-mark of another which has already obtained currency and value in the market. Notwithstanding what two of the Lords said as to the validity of the trade-mark, it does not certainly appear whether the decision went upon the ground that there was a valid trade-mark which had been infringed or upon that of unfair competition. That the plaintiff was entitled to the injunction upon the latter ground can be readily perceived. But one cannot help wondering whether all the Lords agreed that the trade-mark was valid. Then nearly 20 years later the House of Lords had before it Montgomery v. Thompson (1891) A. C. 217. Thompson and his predecessors had bottled ale, at a town in England called Stone,

for 100 years or more. This ale had become known as "Stone Ale." During the above period the brewery of Thompson had been the only one in town. In 1890 Montgomery, who had been a publican at Liverpool, removed to Stone and set up "Montgomery's Stone Brewery." He claimed he had a legal right to use the name "Stone Brewery" so long as he used it in combination with other words which sufficiently distinguished his manufacture from that of Thompson. The court below had issued an injunction restraining him from carrying on his business of a brewer at Stone either under the name "Stone Brewery," or under that of "Montgomery's Stone Brewery," or under any other title so as to represent that the Montgomery Brewery was the brewery of Thompson, and from selling or causing to be sold any ale or beer not of Thompson's manufacture under the term "Stone Ales" or "Stone Ale," or in any way so as to induce the belief that such ale or beer was of Thompson's manufacture. The House of Lords affirmed the injunction. Lord Herschell in his opinion said:

"It appears to me idle to argue in opposition to the injunction that it is against the public interest to permit a monopoly of the use of the name of a town for trade purposes, when the only effect of allowing its use by the person and for the purpose sought to be restrained would be to deceive the public."

In Wotherspoon v. Currie the trade-mark was not actually copied, and while, as the quotations above made show, there are in the opinions rendered by two of the Lords expressions which seem to indicate that in their opinion the trade-mark was not invalid, the case was really decided on the ground that the respondent was acting with the fraudulent design of passing off his own goods as those of the complainant's. And Thompson v. Montgomery does not assert an exclusive right to the use of the word "Stone Ale" as against the world, but as against the defendant who was shown to be engaged in fraudulently using the words for the purpose of passing off his goods as the goods of the plaintiff, as most clearly appears in the opinion of Lindley, L. J., in the Court of Appeal, 41 Ch. Div. 35, 50.

We come now to consider the cases in the Supreme Court of the United States. In Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581 (1871), the complainants claimed an exclusive right to the use of the words "Lackawanna Coal" as a trade-mark for the coal mined by them, and their bill alleged that they had appropriated the word "Lackawanna" as a trade-mark for their coal before any one else had applied it as a trade-mark for any kind of coal. In affirming the court below which had refused the injunction, the court said:

"And it is obvious that the same reasons which forbid the exclusive appropriation of generic names or of those merely descriptive of the article manufactured and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied. They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies." 13 Wall. 324, 20 L. Ed. 581.

In Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, 37 L. Ed. 1144 (1893), the complainant, a manufacturer of flour at Minneapolis, sought to restrain the defendants from using the word "Columbia" in a brand placed on flour sold by them. The court below had dismissed the bill. The Supreme Court in an opinion in which it stated that the general principles of law applicable to trade-marks, and the conditions under which a party may establish an exclusive right to the use of a name or symbol were well settled by its decisions, then went on to say that these decisions establish the following general propositions:

"* * * (4) Such trade-mark cannot consist of words in common use as designating locality, section, or region of country."

In Elgin National Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365 (1901), the Supreme Court had before it the question whether the plaintiff had a trade-mark in the geographical name "Elgin" which it had registered under the act of Congress of 1892. The court held:

"That the general rule applied, and that this geographical name could not be employed as a trade-mark and its exclusive use vested in appellant, and that it was not properly entitled to be registered as such."

In French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247 (1903), the plaintiff claimed a trade-mark in the geographical name "Vichy," which was the name of a commune of France whose springs for several hundred years had been famous for their medicinal qualities. The trial court had dismissed the bill upon the ground that the plaintiff had no exclusive right to the use of the word "Vichy" and that defendant had never been guilty of an attempt to palm off its waters as the imported article (C. C.) 99 Fed. 733. The case was brought to this court, where it was reversed and an injunction was ordered in an opinion which will be subsequently considered. 107 Fed. 459, 46 C. C. A. 418, 65 L. R. A. 830. The Supreme Court did not agree that a case had been made out justifying the issuance of an injunction, as the use of the word "Vichy" on defendant's label was so different in style, language, and form from that of the complainant that it would not deceive the public, and there had been acquiescence for a period of nearly thirty years. Mr. Justice Brown writing for the court said:

"1. As the waters of Vichy had been known for centuries under that name, there is reason for saying the plaintiffs had in 1872 acquired an exclusive right to the use of the word 'Vichy' as against every one whose waters were not drawn from the springs of Vichy, or at least, as observed by a French court, 'from the same hydrographical region which may be called generally the basin of Vichy.'

"True the name is geographical; but geographical names often acquire a secondary signification indicative not only of the place of manufacture or production, but of the name of the manufacturer or producer and the excellence of the thing manufactured or produced, which enables the owner to assert an exclusive right to such name as against every one not doing business within the same geographical limits; and even as against them, if the name

be used fraudulently for the purpose of misleading buyers as to the actual origin of the thing produced, or of palming off the productions of one person as those of another."

We do not understand that the court in the above case decided that a trade-mark exclusive as to some but not as to all is a technical trademark valid at common law. What the court said is entirely consistent with the theory that the owner of the mark might be protected under the law of unfair competition.

In Baglin v. Cusenier Co., 221 U. S. 580, 31 Sup. Ct. 669, 55 L. Ed. 863 (1911), the court had before it the validity of the word "Chartreuse" as a trade-mark. For several hundred years the Order of Carthusian Monks had occupied the Monastery of the Grande Chartreuse near Voiron in France. They there made by a secret process the liqueur which in time became known throughout the world as "Chartreuse." They first manufactured it in the monastery, and later at a place near by called "Fourvoirie." These monks having been forcibly expelled from France set up their factory at a place in Spain where they continued to manufacture the liqueur according to their secret process, and continued its sale on the market as "Chartreuse." The French undertook to produce at Fourvoirie a liqueur resembling as nearly as they could make it the "Chartreuse" of the monks, and they placed their product on the market under the old name. A suit was brought in the Southern district of New York to restrain the use of the name by injunction. The Circuit Judge held that the word "Chartreuse" was a valid trade-mark and was infringed and awarded an injunction. 156 Fed. 1019. On appeal to this court (164 Fed. 25, 90 C. C. A. 499) Judge Coxe writing for this court said:

"Its ['Chartreuse'] primary meaning was undoubtedly geographical, but it acquired afterwards a secondary meaning, so that a purchaser prior to 1901 ordering a case of 'Chartreuse' would expect to receive liqueur made by monks at the French monastery."

We sustained the right to the injunction. In the Supreme Court it was insisted that the judgment was erroneous in holding that the word "Chartreuse" constituted a valid trade-mark. It was argued that "Chartreuse" is a regional name; that the characteristic qualities of the liqueur were due to certain local advantages by reason of the herbs found and cultivated within the district described; that even as used in connection with the monks' liqueur it was still a description of place; and hence that, at most, so far as this word is concerned, the question could be one only of unfair competition. In an opinion written by Mr. Justice Hughes it was declared that the validity of the argument could not be admitted. He said:

"It is not necessary for us to determine the origin of the name of the order and its chief monastery. If it be assumed that the monks took their name from the region in France in which they settled in the eleventh century, it still remains true that it became peculiarly their designation. And the word 'Chartreuse' as applied to the liqueur which for generations they made and sold cannot be regarded in a proper sense as a geographical name. It had exclusive reference to the fact that it was the liqueur made by the Carthusian Monks at their monastery. So far as it embraced the notion of place, the

description was not of a district. but of the monastery of the order—the abode of the monks—and the term in its entirety pointed to production by the monks."

In Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U. S. 251, 36 Sup. Ct. 269, 60 L. Ed. 629 (1916), an injunction was sought to restrain infringement of an alleged trade-mark for shoes consisting of the words "The American Girl," by the use of the words "American Lady." The Circuit Court of Appeals in the Eighth Circuit held that the term "The American Girl" used to designate women's shoes was a geographical and descriptive, rather than an arbitrary and fanciful name, and was not the subject of a valid trade-mark. But it ordered an injunction to issue on the ground of unfair competition. 165 Fed. 413, 91 C. C. A. 363. The Supreme Court declared that it did not regard the words "The American Girl" as used by the complainant in connection with the manufacture of shoes as being a geographical or descriptive term. "It does not signify," said the court, "that the shoes are manufactured in America, or intended to be sold or used in America, nor does it indicate the quality or characteristics of the shoes. Indeed, it does not, in its primary signification, indicate shoes at all. It is a fanciful designation, arbitrarily selected by complainant's predecessors to designate shoes of their manufacture." It held that the trade-mark was good and infringed, and that the injunction should issue on that ground and not on the ground of unfair competition. The Chief Justice and Mr. Justice Van Devanter dissented on the ground that the term was geographical and descriptive and not subject to exclusive appropriation as a trade-mark.

We shall not attempt an examination of all the cases decided in which the validity of geographical terms used as trade-marks have been considered, but shall refer to some of them.

In Coffman v. Castner, 87 Fed. 457, 31 C. C. A. 55, the Circuit Court of Appeals in the Fourth Circuit said:

"A geographical name cannot be appropriated to the exclusive use of any person or company as a trade-mark."

In Genesee Salt Co. v. Burnap, 73 Fed. 818, 20 C. C. A. 27, the Circuit Court of Appeals in the Sixth Circuit said:

"The name 'Genesee,' when used in connection with complainant's salt, obviously refers to the place of its production. The complainant could, therefore, assert no trade-mark property in it."

In Illinois Watch-Case Co. v. Elgin National Watch Co., 94 Fed. 667, 35 C. C. A. 237, the Circuit Court of Appeals for the Seventh Circuit said:

"It is not now a question that no one can acquire an exclusive right to the use of geographical names as trade-marks."

In Allen B. Wrisley Co. v. Iowa Soap Co., 122 Fed. 796, 59 C. C. A. 54, the Circuit Court of Appeals for the Eighth Circuit declared that—

"Geographical terms and words in common use to designate a locality, a country, or a section of a country, cannot be monopolized as trade-marks."

And the same court had previously made the same statement in Shaver v. Heller & Merz Co., 108 Fed. 821, 831, 48 C. C. A. 48, 65 L. R. A. 878.

In La Republique Française v. Saratoga Vichy Springs Co., 107 Fed. 459, 46 C. C. A. 418, 65 L. R. A. 830 (1901), this court said:

"It is true that a mere geographical name, without attending facts which have caused the name to become significant of a particular manufacture and to identify the manufacture as the product of a particular person, is not the subject of a trade-mark."

The court then continued:

"The distinction, however, between mere names of a locality and the secondary signification of names which identify an article with its manufacturer or producer, and which tell the public that an article so produced is of singular excellence, with the result that the use of the name by a nonresident producer is unfair to the competitor and fraudulent to the public, has been long recognized."

In other words, if a geographical term acquires a secondary meaning, there may be a remedy under the doctrine of unfair competition.

In Siegert v. Gandolfi, 149 Fed. 100, 79 C. C. A. 142, this court held that the complainants could not obtain a monopoly in the use of a geographical word as a trade-mark. An injunction was issued, but it went on the ground of unfair competition.

In Wertheimer v. Batcheller Importing Co., 185 Fed. 850 (1911), Judge Lacombe, sitting in the Circuit Court for the Southern District of New York, granted a preliminary injunction preventing the defendant from calling its product "Poudre de Riz de Java," which words constituted the complainant's trade-mark. The court said:

"The phrase 'Poudre de Riz de Java' is apparently no more a statement that the rice used in it was grown on the Island of Java than the use of the phrase 'Eau de Cologne' imports that the liquid perfume thus designated was made at Koln am Rhein."

The phrase had acquired a secondary meaning. And the case may have been decided under the principle of unfair competition. In Stein & Co. v. Liberty Garter Mfg. Co., 198 Fed. 959 (1912), the same judge, sitting in the District Court, granted a preliminary injunction against the use of the word "French" as applied to garters, and in doing so declared that the complainant had "shown its ownership in a valid trade-mark in the word 'Paris' as applied to garters." But as the circumstances are not fully disclosed the exact signification of the decision is not clearly understood.

In 1846, Taylor v. Carpenter, 3 Story, 458, the plaintiffs were manufacturers in Leicester, England, of "Taylor's Persian Thread" and had established agencies in New York, Boston, and other places in this country, for the sale of their threads. They complained that the defendant imitated their names, trade-marks, and labels, and asked for an injunction. Judge Story granted the injunction, saying:

"I have not the slightest doubt, in the present case, that a perpetual injunction ought to be granted."

Nothing was said either upon the argument or in the opinion as to the use of a geographical term as a trade-mark. The case appears

to have been one of unfair competition, although the exact ground upon which it was decided is not disclosed.

In 1844 the same parties had been before Chancellor Walworth in New York, and he granted an injunction, but did not discuss the question whether a geographical name could be used as a trade-mark. Taylor v. Carpenter, 11 Paige (N. Y.) 292, 42 Am. Dec. 114. The case was carried to the Court for the Correction of Errors (2 Sandf. Ch. 604), where it was affirmed, but without discussion as to the validity of a trade-mark consisting of a geographical name.

In Walter Baker & Co. v. Baker (C. C.) 77 Fed. 181, the words "German Sweet Chocolate" were held to be a valid trade-mark and infringed by the words "Germania Sweet Chocolate." The case was decided by a judge sitting in the Circuit Court for the Western District of Virginia. The objection was made that the word "German," the name of the individual manufacturer, was also a geographical name, but the court disregarded the objection, saying: "It is the name of an individual, adopted as an arbitrary or fancy name."

In Wolfe v. Goulard, 18 How. Prac. (N. Y.) 64, "Schiedam Schnapps" was held not to be a good trade-mark; "Schiedam" being the name of a town in Holland, and "Schnapps" being adopted from the German language meaning a dram. The plaintiff used the words to designate the liquor which he sold.

In Lea v. Wolf, 13 Abb. Prac. N. S. (N. Y.) 389, it was held that "Worcestershire Sauce," "Worcestershire" being the name of the place where the plaintiff had carried on the business for 30 years, was not a valid trade-mark, and Ingraham, D. J., said that—

"The whole course of authority on this subject is uniform against the right of any party to obtain a trade-mark by such words."

The injunction was denied. On appeal to the General Term of the Supreme Court the injunction was ordered, the court saying that—

"Where words, and the allocation of words, have, by long use, become known as designating the article of a particular manufacturer, he acquires a right to them, as a trade-mark, which competing dealers cannot fraudulently invade." Abb. Prac. N. S. (N. Y.) vol. 15, p. 3.

In Newman v. Alvord, 51 N. Y. 189, 10 Am. Rep. 588 (1872), the right of the plaintiff to use the word "Akron" as a trade-mark in connection with the production and sale of cement was before the court. It was held that as against the defendants the plaintiff had the right to the exclusive use of the word. The court thought that it was unnecessary to show that the plaintiff had the exclusive right to the word; that it was enough if he had an exclusive right as against the defendant. The case is usually understood to have been decided on the principle of unfair competition.

In Kayser & Co. v. Italian Silk Underwear Co., 160 App. Div. 607, 146 N. Y. Supp. 22 (1914), an injunction issued to protect the trademark "Italian" as applied to silk underwear, the court holding that the word had acquired a secondary meaning. Neither plaintiff nor de-

fendant used any Italian silk in the manufacture of the underwear. The case was decided as one of unfair competition.

In Phenix Cheese Co. v. Kirp, 176 App. Div. 735, 164 N. Y. Supp. 71 (1917), the court issued an injunction to protect the name "Philadelphia Cream Cheese," and the defendants were restrained from using those words. The court thought the name had acquired a secondary meaning, and the injunction went on the ground of unfair competition.

The objection to the use of a geographical name as a trade-mark is twofold:

(1) It does not indicate the origin, manufacture, or ownership of the goods.

(2) There can be no exclusive right to make use of it as any other manufacturer or trader from the same country or section of the country has an equal right to use it.

Thus in the English Court of Chancery Vice Chancellor Wood declared that, if the first importer of wine from Burgundy called it "Burgundy," he could not prevent anybody else from calling a wine produced in Burgundy by the name of the place from which it was imported, although he had stamped "Burgundy" on his corks for 20 years. McAndrew v. Bassett, 4 De G. J. & S., 380. This rests upon the principle that no person has the right to the exclusive use of a mark which is of such a character that others may employ it with equal truth. It was for that reason that the word "Lackawanna" as applied to coal was not a good trade-mark for any one whose coal came from the "Lackawanna Valley" could truthfully designate and sell his coal as "Lackawanna Coal."

That there may be exceptions to the rule that a geographical word cannot be a valid trade-mark is conceded. If one should own the only coal mine situated in a place and should give his coal the name of that place, there is no reason why the name should not be recognized as a valid trade-mark. Newman v. Alvord, 51 N. Y. 189, 193, 10 Am. Rep. 588. Upon that principle was decided Congress & Empire Spring Co. v. High Rock Congress Spring Co., 45 N. Y. 291, 6 Am. Rep. 82, as the plaintiff owned the sole place where the water was found so that none other could use the trade-mark with truth. And this doctrine was recently recognized in Manitou Springs Mineral Water Co. v. Schueler, 239 Fed. 593, 152 C. C. A. 427 (1917).

The courts, too, have sometimes justified a purely arbitrary use of a geographical name where such use could not possibly mislead or deceive any one. Thus in Fleischman v. Shuckmann, 62 How. Prac. (N. Y.) 92 (1881) Judge Van Vorst sitting in the Supreme Court of New York, Special Term, held that a manufacturer of bread in New York City had clearly a right to call it by way of distinction "Vienna Bread," and an injunction was ordered restraining the defendant from applying the word "Vienna" to baked articles. The argument was advanced by the defendant that the plaintiff could have no exclusive right to the use of the name of the capital of Austria, as a trade-mark. But the court rejected it, saying that as a mark for bread it was purely arbitrary and in no manner descriptive either of the ingredients or quality of the article. No deception was practiced by its use "because the place

of its manufacture is given and it is known that bread cannot be imported from abroad for use here." In the course of his opinion Judge Van Vorst said:

"I presume that a baker in Paris or Vienna could manufacture bread there and introduce it under the name of 'New York bread' and use it arbitrarily, and be protected under the laws of their country if he was first to apply 'New York' in such connection."

And where a dentist in St. Louis placed over his office the words "New York Dental Rooms," the court held that he had a proprietary right in the title "New York," as no one would understand that the business was done in the city or state bearing the name used, or that either of those geographical divisions was in any way connected with it. Sanders v. Utt, 16 Mo. App. 322. But the use of the name "Scandinavia" in connection with either the manufacture or the sale of belting does not come within either of these two exceptions.

[4] That geographical names, primarily indicative of place, often acquire a secondary signification indicative of the name of the manufacturer or seller, and the excellence of the thing manufactured or sold, and which enables the manufacturer or seller to assert an exclusive right, is familiar learning supported by a long line of decisions. And that the trade-mark herein involved has acquired such a secondary meaning cannot be disputed upon this record. But the fact that the geographical term has come to have a secondary meaning does not, in the opinion of the court, constitute it a valid trade-mark at common law. The writer understands the law to be that geographical names do not constitute a valid trade-mark at common law unless they have been selected, used, and appropriated under such special circumstances as to point distinctively to origin or ownership. In Baglin v. Cusenier Co., supra, the trade-mark "Chartreuse" was not merely a regional name, but it was peculiarly the designation of the monks (221 U. S. 592, 31 Sup. Ct. 669, 55 L. Ed. 863), and the term pointed to the liqueur manufactured by the monks. This led the court to say that the term as applied to the liqueur could not be regarded in a proper sense as geographical. We may observe in passing that the court in its opinion, written by Mr. Justice Hughes, mentions the fact that it was insisted at the argument that the word did not constitute a valid trade-mark so that at the most the question could be one only of unfair competition. The court did not say that such a conclusion would not follow from such a premise, but denied the premise. If it had denied the conclusion, the claim that a geographical term becomes a valid technical trade-mark at common law when it acquires a secondary meaning indicating origin or ownership would have become the established law so far as the federal courts are concerned, but we are unable to find any such doctrine enunciated in any decision that court has made. In the absence of any such authoritative statement, the court holds that the geographical term "Scandinavia" is an invalid trade-mark at common law as indicating the notion of place and not that of origin and ownership. And see Manitou Springs Mineral Water Co. v. Schueler, 239 Fed. 593, 601, 152 C. C. A. 427.

[5] The question then arises whether we must regard "Scandinavia" as a geographical term or whether we are at liberty to regard it as having been applied in an arbitrary or fanciful sense and on that ground can sustain it as a valid trade-mark. For a word in common use but applied in an arbitrary or fanciful sense may be a good trade-mark. But in 1887 in a case in England before the Court of Appeal where the question was whether the name of a place, "Melrose," could be registered as a trade-mark, Cotton, L. J., said:

"We were asked by the Attorney General * *. * to hold that no geographical expression can come within the description in section 64 * * * as a 'fancy word or words not in common use.' In my opinion that would be wrong. I do not think one could say that no geographical term could possibly be a 'fancy word or words' as applied to a particular article."

He declared that to be a fancy word the word must be one "which obviously cannot have reference to any description or designation of where the article is made or of what character it is." And that it is not enough that it should be shown by evidence that it, in fact, has no such reference, and the incorrect or inappropriate user of a word which is descriptive does not make it a fancy word. "We ought not to consider" he said, "what the result is when that evidence is given, but ought to consider whether, from the name, and from the description of the article to which it is applied, it is obvious, that is to say, whether any ordinary person would understand, that the name could not be intended to designate the place where this was produced." In re Van Duzer's Trade-Mark, L. R. 34 C. D., 623. We think in accordance with the views above expressed that we are not at liberty to regard the term "Scandinavia" as having been used in a fanciful sense, even though it should appear from the evidence that the word was not adopted to signify the place of manufacture, or the place from which the materials were brought, or any process of manufacture peculiar to Scandinavian countries.

[6, 7] It appears, however, that the plaintiff registered the trade-mark under the Act of Congress of February 20, 1905, c. 592, 33 Stat. 724, U. S. Comp. Stat. Ann. 1916, vol. 9, p. 10645. That act does not prescribe what may be valid trade-marks, but simply permits the registration of trade-marks, and such registration in no way validates a trade-mark which was not previously valid, subject to an exception in what is known as the "Ten Years' Clause," which will be considered later. The act provides that "the owner of a trade-mark used in commerce with foreign nations, or among the several states, or with Indian tribes," may obtain registration for such trade-mark by complying with the requirements of the act provided such owner is domiciled in the United States or resides in a foreign country which affords similar privileges to the citizens of the United States. And before considering the effect of this registration we may remark in passing that the use of the word "Scandinavia" as a trade-mark for the particular species of belting manufactured in England by the plaintiff's predecessors did not preclude the protection of the trade-mark in the courts of this country in so far as the goods to which it applied were sold here. In Kidd v. Johnson, 100 U. S. 617, 619, 25 L. Ed. 769, the court de-

clared that the right to use a trade-mark extends everywhere. And in Hanover Milling Co. v. Metcalf, 240 U. S. 403, 416, 36 Sup. Ct. 357, 60 L. Ed. 713, this doctrine is explained and qualified, and the court cites with approval the following statement made by the court below (208 Fed. 519, 125 C. C. A. 51, L. R. A. 1916D, 136):

"Since it is the trade, and not the mark, that is to be protected, a trade-mark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article."

There is, of course, no question but that the English owner of the trade-mark, if it had not assigned its rights to use it in this country to the complainant, might have registered the trade-mark under the act of Congress, as it had made exclusive use of it in England for almost forty years. But the question is whether the plaintiff was entitled to register it in its own name as owner. The defendant asserts that it had no such right and that it has perpetrated a fraud, in that it represented that it was the owner and failed to disclose its relations with the Scandinavia Company, Limited, of England, which was in fact the owner. The questions now to be considered, therefore, are whether the plaintiff was entitled to register the trade-mark, and, if it was, what is the effect of the registration upon the plaintiff's rights?

[8] The plaintiff and the owners of the trade-mark in England entered into an agreement of May 24, 1904, in which the latter company agreed to sell its belting to the plaintiff at prices which were to be determined from time to time and to no other party in the United States for a period of 10 years. That agreement said nothing as to the trade-mark. A second agreement was entered into between the same parties in May, 1907. The second agreement expressly cancels the contract of May 24, 1904, and provides that the English company "covenants and agrees not to sell, rent or consign its belting to any party, person, firm or corporation other than said second party (the plaintiff herein), for use, rental, sale or resale in the United States of America." It also contains a covenant which reads:

"(5) Said first party (the English company) further covenants and agrees that the said second party shall have the exclusive use in said United States of America of any and all trade-marks and (or) trade-names connected with its belting or used by said first party in the marketing of the same."

And it provided that the agreement should cease and terminate on May 24, 1934. This agreement made in effect the plaintiff the exclusive agent of the English company for the sale of its goods in the United States, and it gave the plaintiff the exclusive use of its trade-mark in this country until 1934. So that the question is whether this made the plaintiff the "owner" of the trade-mark for registration purposes under the statute. In Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60, Saxlehner, a resident of Hungary, had agreed with the Apollinaris Company of London that the latter should have the exclusive right to sell Hunyadi water in Great

Britain and the United States, and the court thought that the agreement did not constitute the company Saxlehner's agent, and that the company had no power to bind Saxlehner by its conduct or its admissions as respects his trade-mark. But the agreement between the Apollinaris Company and Saxlehner differed essentially from the agreement in the case under consideration. In that case no agreement was made as to the trade-mark, and the company reserved the right to cancel the contract upon notice. In this case the right to the exclusive use of the trade-mark in the United States is expressly granted and no right to cancel the contract existed in either party. And in the bill of complaint in this case it is alleged that the plaintiff was the agent for the English company for the sale of its goods in the United States and the agency is conceded. In Saxlehner v. Eisner & Mendelson Co. supra, the plaintiff himself registered his trade-mark in this country as unquestionably he had a right to do. That the English company had the right in this case to transfer for a period of years to the plaintiff whatever right in its trade-mark it possessed, and that the plaintiff could protect its right is clear. Estes v. Williams (C. C.) 21 Fed. 189.

The word "owner" varies in its significance according to context and subject-matter and when found in statutes is "given the widest variety of construction." Peterson v. Johnson, 132 Wis. 280, 282, 111 N. W. 659. In America Woolen Co. v. Town of North Smithfield, 29 R. I. 93, 94, 69 Atl. 293 (16 Ann. Cas. 1227), the court comments on "the versatility of the word to suit the circumstances in which it is used," and declared that the word is not "a technical term, but one of wide application in various connections." In Carter v. Bolster, 122 Mo. App. 135, 141, 98 S. W. 105, 106, the court says:

"The word 'property,' as well as 'owner,' may be used to convey a meaning sometimes broad and sometimes quite restricted. In its general and commonly accepted sense, ownership and property would necessarily imply the power of sale—jus disponendi. * * * Doubtless it may and is frequently used in a more restricted sense."

[9] It is an established rule governing the construction of statutes that they are to have a rational and sensible interpretation. The object which the legislative body sought to attain and the evil which it endeavored to remedy may always be considered to ascertain its intention and to interpret its act. United States v. Ninety-Nine Diamonds, 139 Fed. 961, 72 C. C. A. 9, 2 L. R. A. (N. S.) 185. And in Maxwell on the Interpretation of Statutes (4th Ed.) p. 101, the rule is laid down that—

"Even where the usual meaning of the language falls short of the whole object of the Legislature, a more extended meaning may be attributed to it, if fairly susceptible of it."

The exact meaning of the term "owner" as used in the statute under consideration does not appear to have been determined. In Gretsch Mfg. Co. v. Schoening, 6 T. M. Rep. 224 (S. D. N. Y. 1916), Mueller in Germany gave Schoening in the United States the exclusive agency to import and sell the violin strings made in Germany by Mueller and identified by his trade-mark "Eternelle." Schoening registered the

mark in the United States under the act of 1905 relying upon his agency agreement. The District Judge (Judge Hough) held the registration valid, stating that he perceived no objection to Schoening's registering Mueller's trade-mark as long as Mueller gave to him a monopoly of his (Mueller's) business in America. He said:

"The very object of the contract between Schoening and Mueller was to carve out of Mueller's business a portion thereof and confer it upon Schoening, and it seems to me to necessarily follow from that business arrangement between these two men that when Schoening had the business he had the right to protect it pursuant to the act of 1905."

The lower court entered an order granting a preliminary injunction requiring Schoening to withdraw his notice of ownership of the trademark "Eternelle" filed with the Department of the Treasury so far as it applied to violin strings manufactured under that name by Mueller in Germany. That case was brought into this court on appeal. 238 Fed. 780, 151 C. C. A. 630. In affirming that order this court, speaking through Judge Ward, said:

"We assume that Schoening has a valid trade-mark, even if he does not manufacture the strings."

Counsel for plaintiff in the case now under consideration understands from the statement above quoted that this court decided that Schoening had the right to register his trade-mark. In this he is mistaken, for the order entered below was right whether Schoening's registration was valid or invalid, and all that was meant was that, conceding for the purposes of the argument that his trade-mark was valid, the injunction was nevertheless properly ordered to issue against him. But in the case now before us this court holds that one who has the exclusive right to use a trade-mark in the United States has such a special ownership therein as entitles him to its registration during the period of his exclusive use. "Ownership" is the right by which a thing belongs to some one in particular to the exclusion of all others. And the right to the exclusive use of this trade-mark in this country was in this plaintiff for a period of 27 years or 7 years beyond the registration period fixed by the statute. To say that the relation which existed between the English and the American company was that of agency does not help the defendant, for if it be conceded that the relation is that of agency it must also be conceded that it is an agency coupled with an interest, and the right to the exclusive use is one which cannot be withdrawn, and an interest sufficient to prevent revocation is sufficient to make the plaintiff such a special "owner" of the trade-mark as entitled it to register the same under the provisions of the act. To hold that one who has the exclusive right to use a trade-mark has no right to have it registered under the act would be, in our opinion, subversive of the policy and intent of the statute.

If A., the owner of an English trade-mark, assigns the exclusive use of it in the United States for a period of years to B., and C. infringes, the party damaged is B., and he is the party entitled to sue for and to recover the damages, and not A. And we are not prepared to hold that Congress did not intend to give B. the right to protect

his trade-mark by registration under the act unless we are compelled to that conclusion by the wording of the statute. And as we read the statute we think it was intended that one who has the exclusive use of a trade-mark in this country is the "owner" of the trade-mark for the purposes of registration and protection thereunder during the period within which he has such right to the exclusive use.

It is not necessary to say, and we express no opinion upon the question, whether the English owner of the trade-mark could, if it had elected to do so, have registered this trade-mark at any time during the period within which the right to the exclusive use was in another. But we may call attention to the fact that, if the English owner should make application to register the trade-mark at any time after it had granted the exclusive use to the plaintiff, it would be obliged to file along with its application a written declaration and to verify it stating:

"That no other person, firm, corporation, or association, to the best of the applicant's knowledge and belief has the right to use such trade-mark in the United States, either in the identical form or in such near resemblance thereto as might be calculated to deceive." U. S. Compiled Statutes (Compact Edition) 1918, p. 1533, § 9487.

In concluding this particular phase of the subject we may observe that the English company in its assignment to the plaintiff of the exclusive right to the use of the trade-mark in this country did not in terms restrict its use to goods manufactured by it in England, and that in this court it was argued that the plaintiff had thereby acquired the right to use the mark on belting obtained by it from any source whatever, whether English, French, domestic, or otherwise. Under the law of both countries a trade-mark is not the subject of, property except in connection with an existing business. The plaintiff obtained no right in the mark otherwise than with reference to its trade. The right to use the mark in this country was a right to use it as applied to the goods which the plaintiff manufactured or otherwise acquired and sold. The function of the trade-mark being to identify either origin or ownership, it may be that the plaintiff acquired a right to use the mark on any belting it owned, from whatever source obtained. That question is not here and is not decided. If the plaintiff did acquire that right, it would afford a conclusive reason for holding that the plaintiff had such ownership of the trade-mark in the United States as entitled it to its registry.

[10] We come next to consider the effect the registration of the trade-mark has upon the plaintiff's rights. The act contains in section 5 an important provision which reads as follows:

"And provided further, that nothing herein shall prevent the registration of any mark used by the applicant or his predecessors, or by those from whom title to the mark is derived, 'in commerce with foreign nations and among the several states, or with Indian tribes, which was in actual and exclusive use as a trade-mark of the applicant or his predecessors from whom he derived title for ten years next preceding the passage of this act."

If therefore the plaintiff has shown an actual and exclusive use of the word, for 10 years next preceding the passage of the act, by itself or its predecessors from whom it derived title, the above provi-

sion would entitle it to the protection of the word "Scandinavia" as a trade-mark without regard to whether it is or not a "merely geographical" term. The purpose of the above proviso, as this court declared in Thaddeus Davids Co. v. Davids, 178 Fed. 801, 102 C. C. A. 249, was to permit the registration of marks not amounting to technical trade-marks where they had been exclusively used as such for more than 10 years prior to the passage of the act and in which the user had thereby acquired property rights. The case was affirmed upon that point in 233 U. S. 461, 34 Sup. Ct. 648, 58 L. Ed. 1046, Ann. Cas. 1915B, 322. See to the same effect Manitou Springs Mineral Water Co. v. Schueler, 239 Fed. 593, 152 C. C. A. 427; Merriam Co. v. Syndicate Publishing Co., 237 U. S. 618, 35 Sup. Ct. 708, 59 L. Ed. 1148; Coca-Cola Co. v. Nashville Syrup Co. (D. C.) 200 Fed. 153; s. c., 200 Fed. 157. The testimony shows that the word "Scandinavia" has been used in this country as a trade-mark upon belting manufactured in England for the plaintiff and its predecessors and sold here under that name in 1892, or for 13 years prior to the passage of the act, and that the sale under that name has been continuous in this country ever since by the plaintiff and its predecessors in title. Paragraph 5 of the bill of complaint avers that in January, 1892, Beach & Co. obtained from the English company "the exclusive agency for the importation and sale" in the United States of the belting manufactured by it, and that it continued "importing and selling such goods under the trade-mark 'Scandinavia' until in or about September 1899." Paragraph 6 avers that in September, 1899 the Beach & Treiber Company "succeeded to the business, good will, and trade-mark rights of said Beach & Co. in the importation and sale of said Scandinavia belting," and that it continuously carried the business on until May 18, 1904. And paragraph 7 avers that the plaintiff "succeeded to the business, good will, and trade-mark rights of the said Beach & Treiber Company pertaining to the importation and sale of the said belting." And there appears in the record a stipulation, signed by counsel for both parties to this suit, that the above averments may be received with the same force and effect as though proven by competent evidence. We are therefore to proceed upon the assumption that competent evidence shows that from 1892 to 1904 the plaintiff's predecessors made use of the word "Scandinavia" as a trade-mark, and that the plaintiff then succeeded to their rights in the use of that word. In what manner the plaintiff succeeded to their rights the paragraphs of the bill agreed to in the stipulation do not disclose, and with that we are not now concerned.

The question then becomes important, whether this use of the word "Scandinavia" in the United States as a trade-mark for 10 years prior to the passage of the act was an exclusive use. The following excerpt from the record gives the testimony of a witness who stated that he had been engaged for 34 years in the manufacture and sale of cotton belting:

"Q. What kind of belting have you known for the past 35 years associated with the name 'Scandinavia'? A. Only one manufacturer used that name.
"Q. Who is that? A. The Scandinavia Belting Company."

And asked how generally "Scandinavia" belting was known in the United States, he replied that it was known to all users of belting. The plaintiff's manager, being asked whether he had ever heard of any one who prior to the defendant had undertaken to dispute his title to the mark "Scandinavia," answered:

"We only had one case where anybody sold any other belting than 'Scandinavia' under our name (trade-mark), and that was a company in Philadelphia by the name of Osgood, Sayen Company."

That happened, he said, in 1908. That was three years after the passage of the act, and therefore without effect upon the proviso giving a right to registration of a trade-mark exclusively used for ten years prior to the passage of the act. When the attention of the Osgood, Sayen Company was called to their use of the trade-mark, they apologized, said it was a mistake, and discontinued it. And it was not until 1915, 10 years after the act was passed, that the defendant first put on the market its "Scandinavian" brake lining.

The stipulation admits that since 1892 this belting has been imported into the United States by the plaintiff and its predecessors under the trade-name of "Scandinavia," and the record discloses that orders for the belting so imported come "from here and from there and all over the country." The defendant has not contended, and the record would not support the contention if made, that the mark had not been used in commerce with a foreign nation or among the several states for the statutory period. We must therefore hold that as the plaintiff is the "owner" of the trade-mark within the meaning of the Registration Act, and as it and its predecessors from whom it derived title made actual and exclusive use of the word "Scandinavia" as a trade-mark for 10 years, next preceding the passage of the Registration Act, and has been so used in foreign commerce as well as in commerce between the states, and the word has been registered under the act, it is entitled to protection thereunder as a valid trade-mark, without regard to whether it was or not valid at the common law, and prior to its registration.

[11] If we are mistaken in holding that the plaintiff had the right to register the trade-mark as "owner," there is not the slightest ground, in the opinion of the court, for charging the plaintiff with an attempt to defraud the United States or the public because it represented itself as the owner of the trade-mark. A party who acts upon a mistaken view of the law honestly entertained is not guilty of fraud, entitling a party whose own fraud is manifest to defraud the other of that to which in all justice he is entitled. To attribute such a result from such a cause would bring the law itself into disrepute.

[12] In this connection we should perhaps refer to another like ground of defense based on the original adoption of the term "Scandinavia." In Reddaway v. Banham (1896) A. C. 199, 212, Lord Herschell said that where the name of a place precedes the name of an article sold it prima facie means that this is its place of production or manufacture. The plaintiff's belting, however, is not manufactured and never has been manufactured in any of the Scandinavian countries, Ice-

land, Norway, Sweden, or Denmark. It is manufactured in England and is there marked with the trade-mark "Scandinavia" and shipped to the United States.

The defendant claims that the plaintiff's trade-mark is deceptive, and that no protection will be accorded to a trade-mark which involves a false assertion calculated to deceive the public. It is undoubtedly true that he who comes into equity must come with clean hands. In The Leather Cloth Co., Ltd., v. The American Leather Cloth Co., Ltd., 10 Jurist (N. S.) 81, Lord Chancellor Westbury held that a false statement that goods were made by an American firm and in part at a place in America would bar relief. And in Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706, the Supreme Court declared:

"A court of equity will extend no aid to sustain a claim to a trade-mark of an article which is put forth with a misrepresentation to the public as to the manufacturer of the article, and as to the place where it is manufactured, both of which particulars were originally circumstances to guide the purchaser of the medicine."

But if a trade-mark is to be invalidated for fraud because of misrepresentation, the representation should have been made with a fraudulent intent or it should at least appear that some one has been defrauded or is likely to be defrauded. We fail to discover any evidence to that effect in this record. In adopting the word "Scandinavia" there was no ulterior purpose to be served and the parties were innocent of all wrongdoing. It does not appear that the original use of the term added anything whatever to the value of the belting sold under that mark. There is nothing in the record which shows that belting of any sort was even manufactured in any Scandinavian country, or of its having any reputation of particular excellence. The use of the term seems originally to have been due to a fanciful or sentimental reason. The history of the trade-mark is that the inventor of the belting which the plaintiff sells as "Scandinavia Belting" was one William Felton, a Scotchman who lived and worked for some years in Sweden. He no doubt was actuated by an honorable purpose in adopting his trade-mark when he commenced the manufacture of the goods in England. That he who comes into equity must come with clean hands is, of course, true. But it is equally true that a court of chancery is open to redress the wrongs of any one who has not himself been guilty of willful misconduct in regard to the matter in litigation, and no willful misconduct is shown on the part of the plaintiff's predecessors in title, or on the part of the plaintiff, in the original adoption or subsequent use of the trade-mark.

[13] The defendant claims that the mark "Scandinavia" having been used in England on belting made by the English manufacturers under a British patent to Cobbett, a predecessor of the Scandinavia Company, Limited, was descriptively used by the patentee and is now publici juris and became so at the expiration of that patent in 1892. The argument seems to be that because the English company owned a patent which supposedly covered its belting and sold such belting under the mark "Scandinavia," ipso facto, all rights in such mark ceased

when the patent expired and that the mark has ever since been open to the public under the doctrine announced in Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 199, 16 Sup. Ct. 1002, 1014 (41 L. Ed. 118). The doctrine was there stated as follows:

"The result, then, of the American, the English, and the French doctrine universally upheld is this: That where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become, by his consent, either express or tacit, the identifying and generic name of the thing patented, this name passes to the public with the cessation of the monopoly which the patent created."

[14] The doctrine was followed in Merriam Co. v. Syndicate Publishing Co., supra. The doctrine is without application, however, to the facts of the present case. In the Singer Case the patents gave to the Singer Manufacturing Company a substantial monopoly, and the word "Singer" had been adopted by the company as designative of their distinctive style of machines rather than solely indicating the origin of manufacture. So that the word "Singer" came to indicate the class and type of machines that that company made and constituted their generic description. And the court held that on the expiration of the patent the right to make the patented article and to use the generic name passed to the public. The underlying reason upon which the decision rested was the prevention of a perpetuation of the monopoly. Where there has been no patent monopoly, the doctrine does not apply. And in the case at bar there was never any monopoly in the manufacture of the plaintiff's belting. The testimony is that the term "Scandinavia" was not used to indicate a particular weave. There is no proof that the mark was ever used descriptively so as to become a generic or identifying name of the goods. And the evidence shows that both in England and in the United States others were making the same goods and selling them under various trade-marks during the life of the Cobbett patent and long before that patent was applied for. But there is another and conclusive reason why this claim that the name "Scandinavia" became open to the public on the expiration of the patent is of no avail to the defendant, for if it were to be conceded that the doctrine of the Singer Case originally applied the evidence shows that the public did not avail itself of the right, and that now because of the registration of the trade-mark under the 10 years' clause it is not at liberty to violate the plaintiff's exclusive right.

[15] The defendant is charged with unfair competition. The law of unfair competition is broader than is the common law or the statute law of trade-marks, so that one may be entitled to relief on the ground of unfair competition who is denied relief under the law of trademarks, and that is what happened in the court below. That court granted the plaintiff an injunction, although it held its trade-mark void because the judge concluded the charge of unfair competition was sustained by the evidence. In view of the fact that this court holds the registered trade-mark valid, little need be said as to the unfair competition, although if the court had not sustained the validity of the registered trade-mark we should have found no difficulty in affirming that portion of the decree dealing with the question of unfair com-

petition. The charge is that the defendant sells in interstate commerce, and under the name "Scandinavian" belting, which is identical in appearance with that which the plaintiff sells under the name "Scandinavia," and that in soliciting sales and in advertising, selling and billing its goods under the name it has adopted it is trading unfairly. The plaintiff's business in its "Scandinavia" belting last year is shown to have amounted to about $700,000. The treasurer of the company testified that in his opinion its trade-mark is worth to the company at least $500,000, and that the plaintiff expends something like $200,000 a year for the creation and upkeep of the good will that is crystallized in the trade-mark. The defendant commenced its business in 1906, and in 1908 it began selling brake lining similar to the plaintiff's in that it was solid woven. This, of course, it was entitled to do, and it put its product on the market under the trade-mark "Raybestos." In a short time it put on the market a solid woven asbestos brake lining like the plaintiff's under the trade-mark of "Motobestos." This also it had a right to do. Then in 1914 it put on the market a solid woven brake lining under the name "Scandinavian." The plaintiff had been selling under the name "Scandinavia" its solid woven brake lining for Ford cars, and for the cars of other manufacturers, selling to the Ford Automobile Company alone 1,925,000 feet in 1914. The president of the defendant company testified that before he put on the market this "Scandinavian" brake lining he recognized that there was a demand in the trade for the plaintiff's "Scandinavia" brake lining, and that he adopted the designation to sell his brake lining for Ford cars which the plaintiff had been furnishing, and that he visited and solicited orders from the same trade the plaintiff had supplied. The following excerpt from the record is illuminating:

"Q. Did anybody ever inquire of you for 'Scandinavia' lining before you began to use this name? A. Oh, yes; we had numbers of inquiries if we could make a brake lining somewhat on the same order as the 'Scandinavia' lining made by the 'Scandinavia' Belting Company and we said we would try."

That the defendant intended to appropriate the plaintiff's trade by a fraudulent use of the plaintiff's trade-mark is so clear that no one reading the evidence, it seems to us, can doubt it. It adopted the trade-mark "Scandinavian" for no other purpose than to obtain an unfair and fraudulent share of the plaintiff's business, knowing that its use of the trade-mark would mislead the public into the belief that in purchasing the "Scandinavian" product it was obtaining the "Scandinavia" brake lining of the plaintiff. It copied the plaintiff's goods. This, as we have said, it had a right to do. But when it copied the plaintiff's trade-mark, simply changing a substantive into an adjective, it failed to take into account the powers of a court of equity whose highest office it has always been to thwart fraud and to compel the fruits of fraud to be restored to the party defrauded. That the trade-mark is infringed goes without saying.

[16, 17] But the objection had been made that the record does not disclose any loss of sales to the plaintiff or that any one has been actually deceived by what the defendant has done. The objection is

257 F.—61

without merit. It is without merit because, if the plaintiff used a trade-mark to distinguish its goods, neither the defendant nor anybody else has a right to use that mark upon the goods which he sells. As James, L. J., said in Singer Manufacturing Company, 2 Ch. Div. (L. R. 1875–76) 434, although as between the first vendor and the purchaser there may be no fraud, the mark is capable of being used for the purpose of fraud afterwards. To prevent the fraud at once the law does not allow the defendant to put the plaintiff's mark upon its goods. That is the rule in the case of a trade-mark. When it is not the case of a trade-mark, then ordinarily actual fraud must be shown. But even in unfair competition cases the simulation of the well-known and distinctive features of one's goods may be so close that the court will assume an intent to defraud. This court so declared in Enterprise Mfg. Co. v. Landers, Frary & Clark, 131 Fed. 240, 65 C. C. A. 587. And see Collinsplatt v. Finlayson (C. C.) 88 Fed. 693.

So much of the decree as dismissed the cause of action as to the registered trade-mark is reversed, with directions to reinstate the same and sustain the trade-mark. As thus modified, the decree is affirmed, with the costs in both courts to plaintiff-appellant.

WARD, Circuit Judge (concurring). The relation between the English company which manufactures the belting and the plaintiff company which has the exclusive right to sell it in the United States is described throughout the record as an agency. The proof, however, as to the nature of this agency, is so vague that I think it worth while to say something on the subject.

If the plaintiff company is merely the exclusive agent of the English company to sell its product in this country for its benefit upon a fixed commission or for any sum it can get in excess of a fixed price, I think the English company is the owner, both of the trade-mark and of the business to be protected, and is alone entitled to register the trade-mark under the United States statute and to sue for infringement of it or for unfair competition in business here. On this state of facts, the bill should be dismissed.

On the other hand, if the plaintiff company purchases the English company's product outright and sells it for its own benefit, and is given the exclusive right to do so in this country, together with the right to use the trade-mark for that purpose which has come to indicate the plaintiff company as the source and origin of the goods, then the business to be protected is the plaintiff company's business, and it has the right to register the trade-mark under the United States statute and to sue for infringement of it or for unfair competition in business here. Because I assume this to be the true relation between the English and the plaintiff company, I concur in the judgment of the court.